**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

GENERAL LAND OFFICE
OF THE STATE OF TEXAS,

    Plaintiff,

                                  Civ. No. 1:17-cv-538

v.

UNITED STATES FISH AND WILDLIFE
SERVICE; UNITED STATES
DEPARTMENT OF THE INTERIOR;
RYAN ZINKE, in his official capacity as
Secretary for the United States of the Interior;
GREG SHEEHAN, in his official capacity as
Acting Director of the U.S. Fish and Wildlife
Service; and
AMY LUEDERS, in her official capacity as
Southwest Regional Director U.S. Fish and
Wildlife Service,

    Defendants.

**SECOND AMENDED COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

    Plaintiff General Land Office of the State of Texas ("TXGLO" or "Plaintiff") files this

Second Amended Complaint against Defendants due to their ongoing violation of federal law

involving Endangered Species Act regulation of the Golden-Cheeked Warbler.

**INTRODUCTION**

    1.    This is an action for declaratory judgment and injunctive relief by the TXGLO

against the U.S. Fish and Wildlife Service (sometimes referred to hereinafter as the "Service"),

and the U.S. Department of the Interior, as well as Ryan Zinke, Greg Sheehan, and Amy Lueders

in their official capacities (collectively "Federal Defendants") for violating statutory law.  Federal

Defendants violated the Endangered Species Act ("ESA") (16 U.S.C. §1531, *et seq*.) and its

implementing regulations (50 C.F.R. §424.01, *et seq*.), as well as the Administrative Procedure

Act ("APA") (5 U.S.C. §551 *et seq.*) by: 1) maintaining the Golden-Cheeked Warbler ("Warbler") in endangered status for over 26 years while simultaneously failing to designate critical habitat; 2) failing to delist the Warbler in response to the 2015 Petition to Delist and supporting 2015 study produced by the Texas A&M Institute of Renewable Natural Resources ("Delisting Petition"); and 3) failing to comply with the National Environmental Policy Act ("NEPA"), both before listing the Warbler as endangered and prior to denying the Delisting Petition.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction), §1346(a)(2) (civil action against the United States), §2201 (authorizing declaratory relief), §2202 (authorizing injunctive relief), 16 U.S.C. §1540(c), (g) (actions arising under the ESA), and 5 U.S.C. §702 (providing for judicial review of agency action under the Administrative Procedure Act).

3.     On March 1, 2017, more than 60 days prior to the filing of the instant complaint, Plaintiff provided Defendants written notice of violation in accordance with 16 U.S.C. §1540(g)(2)(C).  Defendants did not respond to the 60-day notice.  A true and correct copy of 60-day notice is attached hereto as Exhibit 1 and hereby incorporated by reference.  Plaintiffs have receipts for the delivery of the 60-day notice to all Defendants, and delivery confirmation is attached hereto as Exhibit 2, which is hereby incorporated by reference.

4.     Venue in this judicial district and division is proper under 5 U.S.C. §703 and 28 U.S.C. §1391(e)(1) because the Plaintiff resides in Austin, and 16 U.S.C. §1540(g)(3)(A) because the violation occurred in this district.  Furthermore, the venue of this judicial district and division is appropriate under 28 U.S.C. §1391(e)(1)(B) because the primary authors of the decision denying

the Plaintiff's Petition to Delist were staff members of the Service's Austin Ecological Services Field Office in Austin at the time of the denial.

5.     Declaratory relief is authorized by 28 U.S.C. §§2201 and the Federal Rules of Civil Procedure, Fed.R.Civ.P. 57.  Injunctive relief is authorized by 28 U.S.C. §§2202 and the Federal Rules of Civil Procedure, Fed.R.Civ.P. 65.

## PARTIES

### A,     PLAINTIFF

6.     Plaintiff TXGLO is the oldest state agency in Texas and, among other things, is charged part maximizing revenues from Texas public lands dedicated to the Permanent School Fund.  TXGLO derives those revenues from the sale and mineral leasing of public school lands, which under the Texas Constitution flow to the Permanent School Fund via TXGLO.  T.X. Const. Art. VII §5(g).  TXGLO also owns and maintains State Veterans Homes that provide care and dignity for veterans, their spouses, and Gold Star parents, as well as State Veterans Cemeteries to honor those who have served.

7.     TXGLO owns or maintains public school lands which contain Warbler habitat.

8.     The ability of TXGLO to maximize revenues from Texas public school lands, and to maintain State Veterans Cemeteries and State Veterans Homes to a high standard is undermined by restrictions imposed due to the presence of Warblers on TXGLO property.

9.     The presence of Warblers on TXGLO property has lowered the market value of those properties.

10.     The presence of Warblers on TXGLO property subjects certain TXGLO's actions on its property to the time consuming and costly requirements of Sections 7 and 9 of the ESA.

11.     Delisting the Warbler will provide immediate relief for the TXGLO because TXGLO property will no longer be affected by diminution in market value attributable to Warbler presence on the property, and the property will no longer be subject to the time consuming and costly requirements of Sections 7 and 9 of the ESA.

**B.     <u>DEFENDANTS</u>**

12.     Defendant United States Fish and Wildlife Service is an agency of the Department of the Interior.  The Service has been delegated responsibility by the Secretary of the Interior for the day-to-day administration of the ESA, including listing of threatened and endangered terrestrial species and the designation of their critical habitat.  The United States Fish and Wildlife Service may be served at 1849 C. St., N.W., Washington, D.C. 20240.

13.     Defendant United States Department of the Interior is an agency of the United States.  Congress has charged the Department with administering the ESA for terrestrial species. The United States Department of the Interior may be served in accordance with FED. R. CIV. P. 4(i)(2) by serving the United States Department of the Interior, 1849 C. St., NW, Washington, D.C. 20240.

14.     Defendant Ryan Zinke is the Secretary of the United States Department of the Interior.  He oversees the Department's administration of the ESA and is sued in his official capacity.  Secretary Zinke may be served in accordance with FED. R. CIV. P. 4(i)(2) by serving Secretary Ryan Zinke, United States Department of the Interior, 1849 C St., N.W., Washington, D.C. 20240.

15.     Defendant Greg Sheehan is the Acting Director of the United States Fish and Wildlife Service.  He oversees the Service's administration of the ESA and is sued in his official capacity.  Mr. Greg Sheehan may be served at 1849 C. St., N.W., Washington, D.C. 20240.

16.     Defendant Amy Lueders is Southwest Regional Director of the United States Fish and Wildlife Service.  She oversees the Service's administration of the ESA with respect to a region that includes the State of Texas and is sued in his official capacity.  Ms. Amy Lueders may be served at U.S. Fish and Wildlife Service, 500 Gold Ave., S.W., Albuquerque, N.M. 87102.

17.     All of the Federal Defendants are responsible for the violations alleged in this complaint.

## LEGAL FRAMEWORK

### Listing of Threatened or Endangered Species

18.     Before a species receives full protection under the ESA, it must be listed as "threatened" or "endangered."  A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §1532(20).  An "endangered" species is one "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. §1532(6).  The listing determination must be based on certain factors using the "best scientific and commercial data available."  16 U.S.C. §1533(b)(1)(A).  Economic or other factors may not be considered in making a listing determination.

19.     A species will be listed if it is endangered or threatened due to any one or a combination of the following factors:

(1) The present or threatened destruction, modification, or curtailment of its habitat or range;
(2) Overutilization for commercial, recreational, scientific, or educational purposes;
(3) Disease or predation;
(4) The inadequacy of existing regulatory mechanisms, or
(5) Other natural or manmade factors affecting its continuing existence.

50 C.F.R. §424.11(c)(1)-(5).

20.     Only listed "endangered" species are specifically protected by Section 9 of the ESA, which, among other things, makes it unlawful for any person to "take" such species.  *See* 16 U.S.C. §1538(a)(1)(b).

21.     The term "take" under the ESA means to "harass, harm, hunt, pursue, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  16 U.S.C. §1532(19).

22.     Congress applied the protections for endangered species found in 50 C.F.R. §17.21 to threatened species[1] if the Service applies those protections to rulemaking.  50 C.F.R. §17.31.

23.     Prohibited actions under the ESA include import or export, take, possession and specified other acts, including but not limited to engaging in interstate or foreign commerce, and sale or offering for sale a threatened or endangered species, as the case may be.  50 C.F.R. §17.21(a)-(f).

24.     Under Section 7 of the ESA, federal agencies must engage in a consultation process with the Secretary of the Interior if they believe their project on any property may affect endangered or threatened species.

### Delisting of Threatened or Endangered Species

25.     Every five years the Secretary of the Interior must conduct a status review of each listed species to determine whether a change in the species' listing status is warranted. 16 U.S.C. §1533(c)(2)(A).  During such status reviews, the Secretary must determine whether any species should: (i) be removed from such list; (ii) be changed in status from an endangered species to a threatened species; or (iii) be changed in status from a threatened species to an endangered species. 16 U.S.C. §1533(c)(2)(B).

---

[1] With the exception of 50 C.F.R. §17.21(c)(5), which is not relevant to the instant matter.

26.     A species may be delisted if, after a review of the species, the best scientific and commercial data substantiates that the species is neither threatened nor endangered due to extinction, recovery, or if the original data for classification was in error.  50 C.F.R. 424.11(d).

27.     The factors considered when delisting a species are the same as those when listing a species.  50 C.F.R. §424.11(d).  Additionally, a species may be delisted only if the best scientific and commercial data substantiates that the species is neither endangered nor threatened for one or more of the following reasons: (i) Extinction, (ii) Recovery, or (ii) Original data for classification in error. 50 C.F.R. §424.11(d)(1)-(3).

### Critical Habitat Designation

28.     The purpose of the ESA is to provide a way to conserve the ecosystems upon which endangered and threatened species depend upon.  16 U.S.C. §1531(b).

29.     To achieve that purpose, under Section 4 of the ESA, when listing a species as threatened or endangered, the government has a concurrent duty to designate critical habitat for that species "to the maximum extent prudent and determinable."   16 U.S.C. §1533(a)(3)(A)(i). Critical habitat is defined as:

> (i)  the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of this Act [15 U.S.C. §1533], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> (ii)  specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 4 of this Act [15 U.S.C. §1533], upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. §1532(5)(A).

30.     In the proposed and final listing rules, the Secretary must state his or her reasons for failing to designate critical habitat.  50 C.F.R. §424.12(a).  The Service defines "not prudent" as when any of the following situations exist:

> (i)      The species is threatened by taking or other human activity, and identification of critical habitat can be expected to increase the degree of such threat to the species; or
>
> (ii)      Such designation of critical habitat would not be beneficial to the species, including for reasons that the present or threatened change to the species habitat or range does not pose a threat to the species, or whether any areas meet the definition of "critical habitat."

Designation of critical habitat is "not determinable" when one or both of the following situations exist:

> (i)      There is insufficient data to perform required analyses; or
>
> (ii)      The biological needs of the species are not sufficiently well known to identify any area that meets the definition of "critical habitat."

50 CFR § 424.12(a)(1) & (2).

## Consultation under the ESA

31.     In consultation with the Secretary of the Interior, federal agencies are required to ensure that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."  16 U.S.C. §1536(a)(2).  Section 7 of the ESA also requires a federal agency to consult with the Secretary at the request of a permit applicant, if the applicant "has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species."  16 U.S.C. §1536(a)(3).

32.     Under Section 7, the Secretary must provide the consulting federal agency and applicant with a Biological Opinion summarizing the basis for the opinion and detailing how the project will impact a species or its critical habitat.  See 16 U.S.C. §1536(b)(3)(A).  If jeopardy or adverse modification is found, the opinion must suggest "reasonable and prudent alternatives" that may be taken by the consulting agency or applicant to avoid jeopardy to the species or adverse modification of critical habitat.  *Id.*

33.     If it is determined that the "taking of an endangered species or a threatened species incidental to the agency action" will not jeopardize the species' continued existence or result in the destruction or adverse modification of critical habitat of such species, a written (incidental take) statement must be issued that (1) specifies the impact of such incidental taking on the species; (2) specifies those reasonable and prudent measures that are necessary or appropriate to minimize such impact; and (3) sets forth the terms and conditions with which the agency or applicant must comply to implement the specified measures.  16 U.S.C. §1536(b)(4)(B)(i), (ii) and (iv).

## Citizen Suits Under the ESA

34.     The ESA's citizen suit provision, 16 U.S.C. §1540(g), permits any person to commence a civil suit on his own behalf under several circumstances, one of which is a suit "against the Secretary where there is alleged failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary."   16 U.S.C. §1540(g)(1)(C).

35.     The citizen suit provision negates the "zone of interests" test of prudential standing by broadly providing that "any person may commence a civil suit" to enforce the ESA.  16 U.S.C. §1540(g)(1); *Bennett v. Spear*, 520 U.S. 154, 164 (1997).

**Administrative Procedure Act**

36.     Pursuant to the APA, a court must hold unlawful and set aside agency action, findings, and conclusions that are: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  5 U.S.C. §706(2)(A)-(D).

37.     Section 704 of the APA states that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. §704.

**National Environmental Policy Act**

38.     The National Environmental Policy Act ("NEPA"), 42 U.S.C. §4321, *et seq.*, requires federal agencies to examine the environmental effects of proposed federal actions and to inform the public of the environmental concerns that went into the agency's decision-making. Among other things, NEPA requires "to the fullest extent possible" all agencies of the federal government to prepare environmental impact statements ("EIS") for any "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. §4332(C).  An EIS must include:

> (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.*

39.     NEPA implementing regulations provide federal agencies with the opportunity to prepare an environmental assessment ("EA"), which determines either that an EIS is required, or concludes with a finding of no significant impact, which terminates the agency's NEPA obligations.  40 C.F.R. §1508.9.  Federal agencies must comply with NEPA "to the fullest extent possible."  42 U.S.C. §4332.

40.     Until September 21, 1983, the Service prepared EAs for all endangered species listing actions.  48 Fed. Reg. 49244-02.  Acting upon recommendations from the Council on Environmental Quality, the Service adopted the Council's judgment that Section 4 listing actions are exempt from NEPA review "as a matter of law."  *Id.*

## FACTUAL ALLEGATIONS

### Regulatory History of the Warbler

41.     The Warbler was first mentioned by the Service in a Notice of Review published on December 30, 1982, as a species under consideration for addition to the List of Endangered and Threatened Wildlife.  47 Fed. Reg. 251, 58459.  At that time, the Warbler was categorized as a species for which the Service had information indicating that a proposal to list the species was "possibly appropriate, but for which substantial data are not currently available to biologically support a proposed rule.  Further biological research and field study will usually be necessary to ascertain the status of the taxa in this category, and it is likely that some of the taxa will not warrant listing."  *Id.* at 58454.  The Warbler remained in that category for both the September 18, 1985 Review of Vertebrate Wildlife [50 Fed. Reg. 37958] and the January 6, 1989, Animal Notice of Review [54 Fed. Reg. 554].

42.     On February 2, 1990, a petition was filed seeking an emergency listing for the Warbler, allegedly because the normal listing procedure could be "inadequate to protect the bird

and its habitat from imminent destruction from clearing and development."  55 Fed. Reg. 18846, 18847.

43.     On May 4, 1990, an emergency rule listing the Warbler as endangered was published concurrently with a proposed rule to provide for public comment.  In the proposed rule, the Service stated that after "an extensive review of the status of the golden-cheeked Warbler," it had determined that an "emergency posing a significant risk to the well-being of the golden-cheeked Warbler" existed.  *Id*. at 18847.

44.     In the proposed rule, the Service did not propose to designate critical habitat because it concluded that "critical habitat is not presently determinable."  *Id*. at 18848.

45.     The emergency rule cited past habitat loss and planned development in Travis County and the City of Austin as immediate threats to Warbler habitat, and also cited the risk of habitat destruction that might occur before the Warbler could go through the regular listing process.  55 Fed. Reg. 18844-45.

46.     On December 27, 1990, the final rule listing the Warbler as endangered was published.  55 Fed. Reg. 53153.  In the final rule, the Service listed multiple areas and development projects posing threats to Warblers.  *Id*. at 53157-58.

47.     In the final rule, the Service did not designate critical habitat.  The Service stated that "[c]ritical habitat for this species remains undeterminable at this time."  *Id*. at 53156.  The Service noted that although satellite mapping was used to identify Warbler habitat, "all the specific elements of the habitat that are critical to the survival of the golden-cheeked Warbler are not known."  *Id*.  The Service stated that biological studies were being conducted to address the issue, and gave a deadline of May 4, 1992, to determine and designate critical habitat.  *Id*.

48.     As of the date of the filing of this Complaint, more than 25 years from the date the final listing rule was published, critical habitat for the Warbler has not been designated by the Service.

### 2015 Petition to Delist the Golden-Cheeked Warbler

49.     On June 29, 2015, a group of petitioners submitted to the Service a petition to delist the Warbler.  A true and correct copy of the Petition to Delist ("Petition") is attached as Exhibit 3 and hereby incorporated by reference.  The petitioners included Texans for Positive Economic Policy, Susan Combs, the Texas Public Policy Foundation, and the Reason Foundation.

50.     The Petition provided substantial new scientific information indicating that delisting the Warbler is warranted, based upon a 2015 study on the Warbler conducted by the Texas A&M University Institute of Renewable Natural Resources ("Texas A&M Study").

51.     Included in the Petition was evidence documenting almost five times more Warbler breeding habitat and roughly nineteen times more Warblers in existence than was known at the time of the listing.  *See* Petition, Ex. 3.

52.     The Petition also provided scientific support showing that the Warbler does not currently meet the ESA's definition of "endangered" or "threatened," and is not today "in danger of extinction throughout all or a significant portion of its range," and is unlikely to become so in the foreseeable future.  *See* Petition, Ex. 3.

53.     Finally, the Petition pointed to research indicating that there is consensus among the scientific community that breeding Warblers inhabit a much wider range of habitat types than were identified in the early studies on which the Service relied in making its listing determination.

**Dismissal of Petition to Delist**

54.     On May 25, 2016, the Service issued a 90-Day Finding denying the Petition to Delist.  A true and correct copy of the 90-Day Finding is attached as Exhibit 4 and hereby incorporated by reference.

55.     In its analysis of Listing Factor A (the present or threatened destruction, modification, or curtailment of the species' habitat or range), the Service dismissed the Texas A&M Study as summarizing information already known to the Service and discussed in the most recent 5-year review, which the Service stated represents "the best available body of science known to the Service pertaining to the Status of the Warbler."  In the next line of its analysis, the Service states that it "recognizes that the modeling studies described in the 2015 Texas A&M [Study] do represent the most recent and comprehensive efforts to estimate range-wide Warbler habitat and population size to date."  *See* 90-Day Finding, Ex. 4.

56.     In its analysis of Listing Factor C (disease or predation), the Service states that the Petition's claim that predation does not constitute a significant threat to the continued existence of the Warbler is refuted by the 2014 5-year review, which concluded that urbanization and habitat fragmentation "have likely resulted in increased rates of predation of Warbler nests by a wide variety of animal predators, especially rat snakes."  The 2014 5-year review lists animals which have been known to prey on Warbler nests, which the Service acknowledges is a "natural occurrence in [Warbler] habitat."  Extrapolating from this statement, the Service then states that increased urbanization leads to higher than normal levels of predation.  *See* 90-Day Finding, Ex. 4.

57.     In its analysis of Listing Factor D, the Service contends that "an estimated 29 per cent of existing breeding season habitat was lost between 1999-2001 and 2010-2011," and cites

"increasing urbanization" and "habitat loss" as reasons why the Warbler should not be delisted. *See* 90-Day Finding, Ex. 4.

58.     In its analysis of Listing Factor E, the Service states that "habitat fragmentation, habitat degradation, inappropriate habitat management practices, and excessive noise all contribute to reductions in overall Warbler habitat quality and present a real and significant threat to the long term viability of the species."  The 90-Day Finding does not cite any instances in which these conditions have occurred.  *See* 90-Day Finding, Ex. 4.

59.     The Service has never designated critical habitat for the Warbler.

60.     In the conclusion of the 90-Day Finding, the Service states that the Texas A&M Study "does not present substantial information not previously addressed in the 2014 five-year review for this species and does not offer any substantial information indicating that the petitioned action to delist the species may be warranted."  *See* 90-Day Finding, Ex. 4.

61.     The 2015 Texas A&M Study presents new information gathered after the publication of the 2014 five-year review, in particular that there approximately 5 times more Warbler breeding habitat than estimated at the time of the emergency listing in 1990, and approximately 19 times more Warblers than assumed at the time of the emergency listing in 1990. *See* Texas A&M Study, Ex. 7 at 4, 8.  The Texas A&M Study concluded that the listing of the Warbler was "based upon a fundamental misunderstanding of the existing abundance and population structure" of the Warbler.  *Id*. at 2.

## NEPA Compliance

62.     The Service has acknowledged that it has not complied with the requirements of NEPA in connection with any of its actions regarding the Warbler.  55 Fed. Reg. 53153 at 53159.

**Harm to Plaintiff**

63.     The presence of Warblers on certain TXGLO property significantly impacts the market value of such property.  For example, on a 2,316.45-acre property located in Bexar and Kendall counties ("Rancho Sierra property"), approximately 84.5% of the property contains Warbler habitat.  *Rancho Sierra Property Information*, Ex. 5 at 25.

64.     Clearing or development on the Rancho Sierra property would require a lengthy and costly mitigation process, and experts have estimated that the presence of Warbler breeding habitat diminishes the value of the property by approximately 35%.  *Id*. at 25; *Rancho Sierra "As Is" Valuation*, Ex. 6 at 75.

65.     The reduction in property value caused by the presence of Warbler habitat translates to less money available for fulfilling TXGLO's mission to maximize revenues from Texas public school lands for the benefit of Texas schoolchildren.

66.     The presences of Warblers on TXGLO property subjects certain TXGLO's actions on its property to the time consuming and costly requirements of Sections 7 and 9 of the ESA.

## INJUNCTIVE RELIEF ALLEGATIONS

67.     Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraphs 1 through 66 as though fully set forth herein.

68.     If an injunction does not issue enjoining Defendants from maintaining the Warbler's status as an endangered species under the ESA, Plaintiff will be irreparably harmed.

69.     Plaintiff has no plain, speedy, and adequate remedy at law.

70.     If not enjoined by this Court, Defendants will continue to enforce the Warbler's status as an endangered species under the ESA in derogation of Plaintiff's rights.

71.     Accordingly, injunctive relief is appropriate.

## DECLARATORY RELIEF ALLEGATIONS

72.     Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraphs 1 through 71 as though fully set forth herein.

73.     An actual and substantial controversy exists between Plaintiff and Defendants as to their legal rights and duties with respect to Defendants' obligations to comply with the ESA, NEPA, and the APA in the listing, refusal to delist, and failure to designate critical habitat for the Warbler.

74.     This case is presently justiciable because Defendants' failure to comply with these laws is the direct result of final agency action that has caused and will continue to cause immediate and concrete injury to Plaintiff.  Plaintiff has a vital interest in knowing whether the Warbler's continued listing as an endangered species under the ESA, from which flow statutory obligations and penalties affecting the Plaintiff, is statutorily valid.

75.     Declaratory relief is therefore appropriate to resolve this controversy.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Listing the Warbler as an Endangered Species Was Legally Impermissible Without a Concurrent Critical Habitat Designation and This Violation Continued for over 25 Years in connection with Each Subsequent Required Five-Year Review**

**(Violation of 16 U.S.C. §1533(a)(3)(A)(i), 16 U.S.C. §1533(b)(2), 16 U.S.C. §1533(c)(2), 50 C.F.R. §424.12, 50 C.F.R. §424.19, and 50 CFR 424.21; Alternatively, 5 U.S.C. §706)**

76.     Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraphs 1 through 75 as though fully set forth herein.

77.     Listing the Warbler as an endangered species was legally impermissible without concurrently designating critical habitat, in violation of 16 U.S.C. §1533(a)(3)(A)(i) and 16 U.S.C.

§1533(b)(2).  This violation has continued for over 25 years because it forms the nucleus of a series of related and subsequent wrongful acts in connection with the Service's failure to delist the Warbler during the required five-year reviews under 16 U.S.C. §1533(c)(2).

78.    By listing the Warbler as endangered without concurrently designating critical habitat, and by maintaining the listing for more than twenty-five years thereafter in connection with the required five-year reviews, Defendants have violated not only the ESA's statutory requirements but also the implementing regulations set forth in 50 C.F.R. §424.12, 50 C.F.R. §424.19, and 50 C.F.R . §424.21.

79.    Alternatively, Defendants have violated the APA by agency action which is arbitrary and capricious or otherwise not in accordance with law in listing the Warbler as endangered and maintaining its endangered status for over twenty-five years, including in connection with the required subsequent five-year reviews, without concurrently designating critical habitat.  5 U.S.C. §706(2)(A). Defendants' action is reviewable under 5 U.S.C. §704.

80.    By these acts or omissions Defendants violated 16 U.S.C. §1533(a)(3)(A)(i), 16 U.S.C. §1533(b)(2), 16 U.S.C. §1533(c)(2), as well as 50 C.F.R. §§424.12, 424.19, 424.21, or alternatively, 5 U.S.C. §706(2)(A).  The listing of the Warbler as an endangered species under the ESA is therefore unlawful and invalid.

### Second Claim for Relief

### Failure to Delist the Warbler Based on the Scientific Data
### Presented in Petition to Delist, While Continuing to Refuse to Designate Critical Habitat

### (Violation of 16 U.S.C. §1533(b)(3)(A)
### and 50 C.F.R. §424.14(h)(1); Alternatively, 5 U.S.C. §706)

81.    Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraphs 1 through 80 as though fully set forth herein.

82.     In their 90-Day Finding, Defendants failed to take into account the substantial scientific or commercial information presented, in violation of 16 U.S.C. §1533(b)(3)(A).  By not considering the new and substantial scientific data presented in the Petition to Delist and accompanying Texas A&M Study, Defendants have violated not only the statutory requirement but also the implementing regulations set forth in 50 C.F.R. §424.14(h)(1).

83.     Failing to delist the Warbler in Response to the Petition to Delist while continuing to refuse to designate critical habitat without sufficient justification is a violation of 16 U.S.C. §1533(b)(3)(A), 50 C.F.R. §424.14(h)(1).  The Service's negative 90-Day Finding on the Petition to Delist is therefore invalid.

84.     Alternatively, Defendants have violated the APA by agency action that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law by failing to delist the Warbler in response to the Petition to Delist.  5 U.S.C. §706(2)(A).

### Third Claim for Relief

### Failure to Comply with NEPA

### (Violation of 42 U.S.C. §4332(C) and 5 U.S.C. §706(2)(A))

85.     Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraphs 1 through 84 as though fully set forth herein.

86.     In its final rule listing the Warbler as endangered under the ESA, the government categorically stated that NEPA does not apply to regulations adopted pursuant to section 4(a) of the ESA, and therefore prepared neither an Environmental Assessment nor an Environmental Impact Statement.  55 Fed. Reg. 53159.  Similarly, the government failed to comply with NEPA during the required subsequent five-year reviews, thereby continuing the original violation. Furthermore, the government's failure to comply with NEPA in connection with the 2014 review

constitutes a separate and independent violation of NEPA. In addition, the government failed to comply with NEPA in connection with the 90-Day Petition. Neither the ESA nor any other statute exempts listing decisions or five-year reviews from NEPA compliance, and therefore Defendants' failures are a violation of the requirements of NEPA.

87.     Defendants' failure to comply with NEPA constitutes agency action that is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. §706(2)(B).

## PRAYER FOR RELIEF

**THEREFORE, Plaintiff prays as to the First Claim for Relief:**

That this Court declare the final rule listing the Warbler as an endangered species under the ESA violated the Defendants' nondiscretionary duty under Section 4(a)(3)(i) of the ESA, 16 U.S.C. §1533(a)(3)(A)(i), 16 U.S.C. §1533(b)(2), 16 U.S.C. §1533(c)(2) as well as 50 C.F.R. §424.12, 50 C.F.R. §424.19, and 50 C.F.R. §424.21 because Defendants listed the Warbler as endangered without concurrently  designating critical habitat and for more than twenty-five years afterward, through each required five-year review and through the date of this Complaint, while maintaining the Warbler's endangered status or, alternatively, that the final rule is unlawful under 5 U.S.C. §706 because Defendants' listing of the Warbler without concurrently designating critical habitat while maintaining the endangered status of the Warbler for over twenty-five years was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**As to the Second Claim for Relief:**

That this Court declare the 90-Day Finding on the Petition to Delist violated 16 U.S.C. §1533(b)(3)(A), as well as 50 C.F.R. §424.14(h)(1), by the Service's failing to consider the substantial scientific or commercial information available in deciding not to delist the Warbler,

and is therefore unlawful, or alternatively, that Defendants' failure to delist the Warbler in response to the Petition to Delist is unlawful because it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. §706(2)(A).

**As to the Third Claim for Relief:**

That this Court declare the final rule listing the Warbler as an endangered species under the ESA is unlawful, and that the refusal to delist the Warbler in response to the Petition to Delist is unlawful, under 5 U.S.C. §706, because Defendants failed to comply with NEPA when listing the Warbler as endangered and for more than twenty-five years afterward, through each required five-year review, and in connection with the denial of the Petition to Delist, through the date of this Complaint, while maintaining the Warbler's endangered status.

**As to all Claims for Relief:**

That this Court:

(a)  issue a judgment and order enjoining Defendants from enforcing or otherwise acting pursuant to the final rule listing the Warbler as endangered under the ESA;

(b)  issue a declaration that the continued listing of the Warbler is invalid;

(b)  award Plaintiff's attorneys' fees and costs to the extent permitted by law; and

(c)  grant such other relief as the Court shall deem just and proper.

Dated: October 19, 2017                      Respectfully submitted,

ROBERT E. HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
THEODORE HADZI-ANTICH
California Bar No. 264663
tha@texaspolicy.com
ERIN WILCOX
N.C. Bar No. 40078
ewilcox@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
Center for the American Future
901 Congress Avenue
Austin, Texas 78701
Telephone:     (512) 472-2700
Facsimile:     (512) 472-2728

*Attorneys for Plaintiff*
*General Land Office of the State of Texas*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Texas by using the CM/ECF system, which will serve a copy of the same on the counsel of record.

_____

ROBERT HENNEKE