# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| GENERAL LAND OFFICE OF THE STATE OF TEXAS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | No.  A-17-CA-00538-SS |
| v. | ) | |
| | ) | |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al. | ) | |
| | ) | |
| *Defendants*. | ) | |

## FEDERAL DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ......................................................................................................... 1

II.   LEGAL AND STATUTORY BACKGROUND .................................................... 2

    A.    The Endangered Species Act ....................................................................... 2

III.  FACTUAL BACKGROUND .................................................................. 6

IV.   STANDARD OF REVIEW .................................................................... 9

V.    ARGUMENT....................................................................................... 10

    A.    The Service Applied the Appropriate Standard for Reviewing the Petition to Delist. .. 10

    B.    The Lack of Critical Habitat Is Irrelevant to the Service's Determination and the Court's
          Review. ................................................................................................. 14

    C.    The Service Rationally Concluded That the Petition to Delist Did Not Present Substantial
          Information Indicating that Delisting May Be Warranted. ................................................. 16

        1.  Factor A – Present or Threatened Destruction, Modification or Curtailment of the
            Species' Habitat. .................................................................................. 17

            a.   The Petition Did Not Present Substantial Information Discounting Major Habitat
                 Threats to the Warbler. ...................................................................... 18

            b.   The Petition's Arguments on Total Warbler Population Did Not Rise to the Level of
                 Substantial Information Indicating that Delisting May Be Warranted. ...................... 22

        2.  Factor C – Disease or Predation ......................................................... 28

        3.  Factor D – Existing Regulatory Mechanisms .............................................. 30

        4.  Factor E – Other Natural or Manmade Factors ............................................ 35

VI.   CONCLUSION.................................................................................... 37

## I.      INTRODUCTION

The United States Fish and Wildlife Service ("the Service"); the United States Department of the Interior; Ryan Zinke, in his official capacity as Secretary of the Interior; Greg Sheehan, in his official capacity as Principal Deputy Director of the Service; and Amy Lueders, in her official capacity as Southwest Regional Director for the Service (collectively, "Federal Defendants") hereby file this combined cross motion for summary judgment and opposition to Plaintiff's motion for summary judgment in the above-captioned case pursuant to Federal Rule of Civil Procedure 56.  Federal Defendants are entitled to judgment as a matter of law on the sole remaining claim raised in Plaintiff's Corrected Second Amended Complaint, ECF No. 56.

The golden-cheeked warbler is a unique songbird that breeds only in mature Ashe juniper-oak woodlands in central Texas and has been on the list of endangered species under the Endangered Species Act ("ESA") since 1990.  Considering the information presented in the 2015 petition to remove the golden-cheeked warbler from the list of endangered species ("Petition to Delist") and the information in its own files, the Service concluded that a reasonable person would find that the golden-cheeked warbler faces serious threats of habitat destruction, fragmentation, and degradation, which are exacerbated by predation that may increase as fragmentation continues, the lack of adequate regulatory mechanisms, and other natural and manmade threats.  The Service rationally determined that the Petition to Delist did not meaningfully contest the existence of serious threats to the Warbler and did not present substantial information indicating that delisting may be warranted.  The Service's conclusion was supported by the record and adequately explained.  Therefore, the Service's application of its expertise to evaluate the Petition to Delist deserves deference, and its 90-day Finding was not arbitrary or capricious.

## II.    LEGAL AND STATUTORY BACKGROUND

### A.    The Endangered Species Act

In 1973, Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  Section 4 directs the Secretary of Interior ("the Secretary") to determine whether a species should be listed as endangered or threatened.[1]  16 U.S.C. § 1533(a).  ESA Section 4(a)(1) sets forth five factors that must be considered in a listing or delisting determination: (1) the present or threatened destruction, modification, or curtailment of the species' habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; and (5) other natural or manmade factors affecting its continued existence.  16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c).  Relying on the best available science, the Service must evaluate these five factors to determine whether a species is "endangered," i.e., in danger of extinction throughout all or a significant portion of its range, or "threatened," i.e. likely to become endangered in the foreseeable future. 16 U.S.C. §§ 1532(6), (20), 1533(b)(1)(A).  Once a species is listed as endangered or threatened, specific protections are accorded that species.  Id. §§ 1533, 1536, 1538, 1539.  The ESA also requires the Secretary to conduct a review of the status of all listed species at least once every five years, known as a "five-year review."  Id. § 1533(c)(2).

---

[1] The Secretaries of the Interior and Commerce share responsibility for listing species under the ESA. 16 U.S.C. § 1532(15); 50 C.F.R. § 17.2(b). The Secretary of the Interior, acting through the Service, is generally responsible for all terrestrial and freshwater species, including the golden-cheeked warbler.

To remove a species from the list of threatened and endangered species, known as "delisting" the species, the agency must consider the same five factors from ESA Section 4(a)(1). The Service may delist the species only if the data pertaining to those factors indicate that it is no longer endangered or threatened for one or more of the following reasons: (1) the species has gone extinct; (2) the species has recovered to the point that the best scientific and commercial data available indicate that it is no longer endangered or threatened; or (3) "subsequent investigations may show that the best scientific or commercial data available when the species was listed, or the interpretation of such data, were in error." 50 C.F.R. § 424.11(d).

A species may be added to or removed from the list of threatened and endangered species (i.e., listed or delisted) either on the initiative of the Service or as a result of a petition by an interested person. 16 U.S.C. § 1533(b)(3)(A). The Service is required "[t]o the maximum extent practicable, within 90 days after receiving the petition of an interested person," to make a finding as to "whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* This finding is known as the "90-day" finding and is published in the Federal Register. *Id.* If the Service determines that the petition presents substantial information indicating that the petitioned action may be warranted, it commences a "review of the status of the species concerned," which culminates in a "12-month finding" determining whether the petitioned action is warranted. *Id.* § 1533(b)(3)(A), (B). If the Service determines that the petition does not present substantial information indicating that the petitioned action may be warranted, the Service makes a negative 90-day finding and no further action on the petition is required. Negative 90-day findings are final agency action and may be challenged in federal district court. *Id.* § 1533(b)(3)(C)(ii).

The ESA also requires the Service "to the maximum extent prudent and determinable" to designate critical habitat for a species concurrently with the listing of the species. *Id.* § 1533(a)(3)(A)(i); *see also id.* § 1533(b)(6)(C) (permitting the Secretary to extend the deadline for designating critical habitat up to two years after the publication of the proposed rule to list the species if critical habitat is not "determinable"). Unlike for listing decisions, which must be based solely on the best available science regarding the species' status, the Service must consider "the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat" before designating critical habitat. *Id.* § 1533(b)(2).

When a species is listed, the ESA provides certain protections to that species. First, ESA Section 7(a)(2) provides that federal agencies must ensure that any action authorized, funded, or carried out by such agency is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical habitat]." 16 U.S.C. § 1536(a)(2). To achieve this objective, the ESA requires the agency proposing an action to consult with the Service or the National Marine Fisheries Service whenever a federal action "may affect" an endangered or threatened species. 50 C.F.R. § 402.14(a). If the federal action is likely to adversely affect a listed species, the Service will issue a biological opinion advising the agency whether jeopardy is likely to occur for any listed species and, if so, whether "reasonable and prudent alternatives" exist to avoid jeopardizing the continued existence of the species. *Id.* § 402.14(h)(3). Section 7 does not apply to private landowners or any private actions that do not obtain approval or funding from the federal government.

Additionally, Section 9 of the ESA prohibits the "taking" of any endangered species of fish or wildlife. 16 U.S.C. § 1538(a)(1)(B). "Take" as defined by the ESA means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct.

16 U.S.C. § 1532(19). The ESA's prohibition on taking species applies to all "person[s]," including individuals, corporations, and federal or state agencies. 16 U.S.C. § 1532(13).

Section 10 of the ESA establishes a permit process through which a private or non-federal party may receive a permit authorizing incidental take of listed species under certain circumstances. 16 U.S.C. § 1539(a)(2)(B)(i)-(v). *See* H.R. Rep. No. 97-567, 31 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2831. To secure a Section 10 permit, the applicant must submit a "Habitat Conservation Plan" specifying: (1) the likely impact of the taking; (2) steps being taken to minimize those impacts and the funding available to implement those steps; (3) alternatives considered and the reasons they were rejected; and (4) other measures the Secretary deems necessary or appropriate. 16 U.S.C. § 1539(a)(2)(A); 50 C.F.R. §§ 17.22(b)(1); 17.32(b)(1). After a complete application has been filed and all public comment considered, the Secretary shall issue the permit if "he has received such other assurances as he may require that the plan will be implemented" and he finds that

> (i) the taking will be incidental;
> (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;
> (iii) the applicant will ensure that adequate funding for the plan will be provided;
> (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and
> (v) [other measures required by the Secretary] will be met.

16 U.S.C. § 1539(a)(2)(B). A permit will also "contain such terms and conditions as the Secretary deems necessary or appropriate." 16 U.S.C. § 1539(a)(2)(B). Taking of a listed species in compliance with the requirements of a Section 10(a)(1)(B) permit does not violate Section 9. 16 U.S.C. § 1539(a)(1)(B).

### III.    FACTUAL BACKGROUND

The golden-cheeked warbler (or "Warbler") is a small, migratory songbird that breeds exclusively in parts of central Texas.  *See* Endangered and Threatened Wildlife and Plants; Proposed Rule to List the Golden-cheeked Warbler as Endangered, 55 Fed. Reg. 18,846-01, 18,846 (May 4, 1990).  The Warbler uses the bark from Ashe juniper trees to construct its nests.  *Id.*  Prior to 1990, the widespread removal of juniper trees in Texas greatly reduced the available habitat for golden-cheeked warblers.  *Id.*  In February 1990, the Service received an emergency petition to list the Warbler as endangered.  *Id.* at 18,847.  The Service found that the petition was warranted and issued an emergency rule temporarily listing the golden-cheeked warbler as endangered pursuant to Section 4(b)(7) of the ESA, 16 U.S.C. § 1533(b)(7).  *See* Endangered and Threatened Wildlife and Plants; Emergency Rule to List the Golden-cheeked Warbler as Endangered, 55 Fed. Reg. 18,844-01 (May 4, 1990).  At the same time, the Service issued a proposed rule to permanently add the Warbler to the endangered species list.  55 Fed. Reg. 18,846-01.

In December 1990, the Service issued the final rule listing the golden-cheeked warbler as endangered under the ESA.  *See* Endangered and Threatened Wildlife and Plants; Final Rule to List the Golden-cheeked Warbler as Endangered, 55 Fed. Reg. 53,153-02 (Dec. 27, 1990).  The 1990 Final Rule explained that the Warbler migrates south to Mexico, Guatemala, Honduras, and Nicaragua each winter, then returns to its breeding territory in Texas around mid-March.  *Id.* at 53,154.  The Warbler returns to the same area year after year and has a "narrow tolerance" for habitat characteristics.  *Id.*  The 1990 Final Rule addressed each of the five statutory listing factors pursuant to 16 U.S.C. § 1533(a)(1) and concluded that present and threatened destruction of

Warbler habitat, nest predation, the inadequacy of existing regulatory mechanisms, and habitat fragmentation all favored the listing of the Warbler. *Id.* at 53,156-59.[2]

In 1992, the Service issued a Recovery Plan for the Warbler. *See* AR 7028-7124. The Recovery Plan stated that the Warbler would be considered for delisting when the following "Recovery Criteria" were met:

> (1) sufficient breeding habitat has been protected to ensure the continued existence of at least one viable, self-sustaining population in each of eight regions outlined in the plan,
> (2) the potential for gene flow exists across regions between demographically self-sustaining populations where needed for long-term viability[,]
> (3) sufficient and sustainable non-breeding habitat exists to support the breeding populations,
> (4) all existing golden-cheeked warbler populations on public lands are protected and managed to ensure their continued existence, and
> (5) all of these criteria have been met for 10 consecutive years.

AR 7033. The Service also laid out a plan to achieve this recovery by encouraging research on the Warbler, establishing areas of quality habitat and interconnecting habitat within the eight regions of the breeding range by protecting populations on public lands, encouraging conservation by private landowners, protecting the Warbler's winter habitat and migratory corridor, increasing public awareness about the Warbler and natural ecosystems, and taking other steps to manage and protect the population and its habitat. AR 7077-7079.

In 2014, the Service completed a five-year status review of the Warbler pursuant to 16 U.S.C. § 1533(c)(2). *See* AR 6774-6798. The five-year review surveyed the best available science and concluded that the Warbler was still "in danger of extinction throughout its range" and should remain listed as an endangered species. AR 6789.

---

[2] At the time of the listing, critical habitat for the species was "undeterminable" because of a lack of sufficient information. *Id.* at 53,156. The Service never designated critical habitat for the Warbler.

About a year later, the Texas Public Policy Foundation and other entities submitted a petition to remove the Warbler from the endangered species list ("Petition to Delist" or "the Petition").  *See* AR 2-38.  In December 2015, the petitioners submitted supplemental information in support of their petition.  *See* AR 114-138 ("Supplement to the Petition").  The Service reviewed the Petition and the information presented in it, as well as the information the Service had in its files at the time that the Supplement to the Petition was received.  *See* AR 440; *see* 16 U.S.C. § 1533(b)(3)(A).  In its May 25, 2016, 90-day Finding, the Service acknowledged that the Warbler's population size and potential range were larger than estimated at the time of the 1990 listing, but noted that "threats of habitat loss and habitat fragmentation are ongoing and expected to impact the continued existence of the warbler in the foreseeable future."  AR 449.  The Service found that the Petition to Delist did not present substantial information not previously addressed in the 2014 five-year review for the Warbler or call into question the Service's conclusion in the five-year review that the Warbler has not recovered, faces "ongoing wide-spread destruction of its habitat," and "continues to be in danger of extinction throughout its range."  AR 449.  The Service concluded that the petition did not present substantial information indicating that delisting the Warbler may be warranted.  AR 449.

On June 5, 2017, Plaintiff filed its Complaint, initiating this lawsuit.  ECF No. 1.  Plaintiff subsequently amended its Complaint twice in response to motions to dismiss filed by Federal Defendants.  ECF Nos. 33, 40.  Plaintiff's Second Amended Complaint raised three claims: (1) the 1990 listing of the golden-cheeked warbler as endangered without the concurrent designation of critical habitat violated the ESA or APA; (2) the 90-day Finding violated the ESA and APA by failing to delist the Warbler in response to the Petition to Delist; and (3) the Service failed to comply with the National Environmental Policy Act ("NEPA") when listing the Warbler as

endangered, completing five-year reviews of the species' status, and issuing the 90-day Finding. Second Am. Compl. ¶¶ 76-87, ECF No. 40.  Federal Defendants moved to dismiss the first and third claims in the Second Amended Complaint.  ECF No. 41.  On November 30, 2017, the Court granted the motion to dismiss, determining that the statute of limitations barred Plaintiff's challenges to the 1990 listing of the Warbler as endangered, the 1990 failure to designate critical habitat, and the 1990 failure to analyze the listing under NEPA.  ECF No. 47 at 12.  The Court also found that Plaintiff failed to state a claim under NEPA.  *Id.* at 15.  With the first and third claims dismissed, the only claim before this Court is whether the Service's 90-day Finding was arbitrary and capricious.

## IV.    STANDARD OF REVIEW

Challenges to listing determinations under the ESA are subject to judicial review under Section 706(2)(A) of the Administrative Procedure Act (APA).  5 U.S.C. § 706(2)(A); *see Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998).  Courts will set aside the Service's decisions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This "arbitrary and capricious" standard is "highly deferential," *Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 379 (5th Cir. 2008) (internal quotation marks omitted), and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The agency's decision warrants deference if it considered the relevant data and articulated a "rational connection between the facts found and the choice made."  *Id.* (internal quotations marks omitted).  Courts must be particularly deferential to agency determinations made within the scope of the agency's expertise. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000); *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006).  When reviewing a negative

90-day finding, "the issue before the Court is not whether a reasonable person could accept [the petitioner's] interpretation of the data, but whether the [agency] had a rational basis for concluding that a reasonable person would not do so." *Palouse Prairie Found. v. Salazar*, No. CV-08-032, 2009 WL 415596, at *2 (E.D. Wash. Feb. 12, 2009), *aff'd*, 383 F. App'x 669 (9th Cir. 2010); *see also State of La., ex rel. Guste v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988) ("[T]he agency's decision need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record.").

Finally, where the Court is reviewing an agency decision under the APA, summary judgment is the appropriate means for resolving claims because the Court is reviewing the legality of the agency action, not acting as the initial factfinder.  *See Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *see also Texas Oil & Gas*, 161 F.3d at 933-34.  Thus, the Court may not "reweigh the evidence or substitute its judgment for that of the administrative fact finder."  *Cook*, 750 F.2d at 392.  The Court's review is limited to the administrative record before the agency at the time of its decision.  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

## V.    ARGUMENT

### A.    The Service Applied the Appropriate Standard for Reviewing the Petition to Delist.

The administrative record demonstrates that the Service utilized the correct standard to evaluate the Petition to Delist.  The first page of the Service's 90-day Finding states that the Service will "make a finding on whether a petition to list, delist, or reclassify a species presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  AR 440 (citing 16 U.S.C. § 1533(b)(3)(A)).  The Service also correctly identified the standard for substantial scientific or commercial information at the 90-day Finding stage as "that amount of information that would lead a reasonable person to believe that the measure proposed in the

10

petition may be warranted."  AR 440 (quoting 50 C.F.R. § 424.14(b) (2016)).[3]  The Service appropriately applied this standard throughout its decision.

Plaintiff's motion for summary judgment disregards the fact that "[i]t is the petitioner's burden to provide the Service with the necessary 'substantial scientific or commercial information.'"  *W. Watersheds Project v. Norton*, No. CV 06-00127-S-EJL, 2007 WL 2827375, at *2 (D. Idaho Sept. 26, 2007) (citing 16 U.S.C. § 1533(b)(3)(A) and 50 C.F.R. § 424.14(b)); *see also WildEarth Guardians v. U.S. Sec'y of the Interior*, No. 4:08-cv-00508-EJL-LMB, 2011 WL 1225558, at *3-*4 (D. Idaho Feb. 11, 2011).  The petition must also "contain[] detailed narrative justification for the recommended measure."  *W. Watersheds Project*, 2007 WL 2827375, at *5 (citing 50 C.F.R. § 424.14(b)(2)(ii)).  Although there is no dispute that the Service cannot require conclusive evidence from a petitioner, this does not change the fact that the burden is on the petitioner to provide substantial information and a narrative explanation for why the petitioned action may be warranted.  In fact, when it amended the ESA in 1982, Congress "*raise[d]* the burden upon a petitioner requesting a species listing or delisting" by adding the word "substantial" to qualify the amount of information required under Section 4.  H.R. Rep. No. 97-567, at 18, reprinted at 1982 U.S.S.C.A.N. 2807, 2818 (1982) (emphasis added); *see* U.S. Fish and Wildlife Service Guidance on Making 90-Day Petition Findings Under Section 4(b)(3)(A) of the Endangered Species Act ("90-day Finding Guidance") at 4, *available at*

---

[3] In regulations promulgated after this 90-day Finding, this section was replaced by 50 C.F.R. § 424.14(h)(1)(i), which states: "For the purposes of this section, 'substantial scientific or commercial information' refers to credible scientific or commercial information in support of the petition's claims such that a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted. Conclusions drawn in the petition without the support of credible scientific or commercial information will not be considered 'substantial information.'"  For the purposes of this brief, citations to 50 C.F.R. § 424.14 refer to the version of the regulation that was effective prior to October 26, 2016, and therefore in place at the time of the agency's decision.

https://www.fws.gov/endangered/esa-library/pdf/Appendix%20B_Guidance%20on%20Making %2090-day%20Petition%20Findings.pdf (Service Guidance noting that "substantial" refers to "the quality of the information (scientific methods and results) and not the quantity or aggregate size of publications or reports"); *see also* Black's Law Dictionary (10 ed. 2014) (defining substantial as "[c]onsiderable in amount or value").

Additionally, the 90-day Finding must be reviewed under the "highly deferential" arbitrary and capricious standard. *See Hayward*, 536 F.3d at 379. The agency's finding warrants deference if the Service considered the relevant data and articulated a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Sierra Club v. Glickman*, 67 F.3d 90, 97 (5th Cir. 1995). Plaintiff relies heavily on the "reasonable person" standard, to the point of ignoring the deference afforded to agency decisions. *See, e.g.*, Pl.'s Mot. for Summary Judgment ("Pl.'s Br.") at 25, ECF No. 64. At first glance, it may be difficult to reconcile the "reasonable person" standard with the typical deference that applies in APA cases. However, the two standards are compatible—and both must be part of the Court's review. The Court must defer to the agency's determination, based on its scientific expertise, of whether the petition presents information substantial enough that a reasonable person would conclude that the petitioned action may be warranted. As one court explained it, when reviewing a negative 90-day finding, "the issue before the Court is not whether a reasonable person could accept [the petitioner's] interpretation of the data, but whether the [agency] had a rational basis for concluding that a reasonable person would not do so." *Palouse Prairie Found.*, 2009 WL 415596, at *2.

There are several different ways that the Service can provide a "rational basis" for determining that a petition does not present substantial information that the requested action may be warranted. First, the Service need not "blindly accept statements in petitions that constitute

12

unscientific data or conclusions, information FWS knows to be obsolete, or unsupported conclusions of petitioners." *Ctr. for Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137, 1142 (D. Colo. 2004); *see Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 109-111 (D.D.C. 2018) (the Service may determine that petitioner's "evidence is unreliable, irrelevant, or otherwise unreasonable to credit").   Second, the Service may determine, as an exercise of its scientific judgment, that certain inferences drawn by the petitioner are not warranted when considering the totality of the information before it.  *See Palouse Prairie Found.*, 2009 WL 415596, at *5-*6; *Morgenweck*, 351 F. Supp. 2d at 1142 ("FWS can rely on what is within its own expertise and records to reject petitions consistent with ESA standards.").   Additionally, the Service could find that the information Petitioner presents, while valid, is not substantial enough to indicate that the petitioned action may be warranted.  *See Palouse Prairie Found. v. Salazar*, 383 F. App'x 669, 670 (9th Cir. 2010) (negative 90-day finding had a rational basis where the Service stated the correct standard and applied it in determining that the "limited and inconclusive" evidence regarding the species was not substantial enough); *WildEarth Guardians v. Salazar*, No. 10-CV-00091-WYD, 2011 WL 4102283, at *6 (D. Colo. Sept. 14, 2011) (finding the Service's negative 90-day finding on a petition to list a species reasonable where "even though there were one or more potential threats cited in connection with the Beetle, the Service found that there was not *substantial documentation* to indicate that these threats were currently affecting the Beetle or reasonably likely to affect the Beetle in the future") (emphasis added); *Defs. of Wildlife v. Kempthorne*, CV 05-99-M-DMW, 2006 WL 8435908, at *7 (D. Mont. Sept. 29, 2006).  Consistent with this legal standard, the Service adequately explained why the information presented in the Petition was not substantial enough to indicate that the delisting of the Warbler may be warranted.

**B.      The Lack of Critical Habitat Is Irrelevant to the Service's Determination and the Court's Review.**

Plaintiff alleges that the Service "never articulated a rational connection between its primary reason for listing the Warbler (habitat destruction) and its decision not to designate critical habitat" and that this "significant flaw" runs throughout the 90-day Finding.  Pl.'s Br. at 25. However, the Service had no obligation or reason to address the designation of critical habitat in its 90-day finding on the Petition to Delist.  First, and most critically, the Petition to Delist did not argue that the lack of critical habitat rendered the listing invalid or called into question the conclusion that the Warbler faces threats to its habitat.  The Petition to Delist only mentions the lack of critical habitat to argue that the 1990 listing was made at a time when there was not much information about the Warbler, AR 12, and that delisting the Warbler would not remove critical habitat protections because they were never put in place, AR 25.  The purpose of the 90-day Finding was to evaluate the arguments and information put forth *in the Petition to Delist*, not to predict or pro-actively address issues that were not raised.  Thus, Plaintiff cannot raise arguments in this litigation that were not presented "within the four corners of their petition."  *Wildearth Guardians v. U.S. Sec'y of the Interior*, No. 4:08-CV-00508-EJL-LMB, 2011 WL 1225547, at *4 (D. Idaho Mar. 28, 2011).[4]

Even if the Petition to Delist had argued that the failure to designate critical habitat called into question the Service's listing determination, the Service would have been correct not to consider that factor in evaluating whether the delisting of the Warbler may be warranted.  The ESA provides that a species must be listed or delisted based upon whether it is in danger of extinction

---

[4] Additionally, any claims Plaintiff originally raised regarding the failure to designate critical habitat in 1990 have been dismissed by this Court as outside of the statute of the limitations.  *See* ECF No. 47 at 12.  Plaintiff cannot use their 90-day Finding claim to relitigate dismissed claims.

throughout all or a significant part of its range, a determination made "*solely* on the basis of the best scientific and commercial data available" as applied to the five statutory factors.  16 U.S.C. § 1533(a)(1), (b)(1)(A) (emphasis added); *see also* 50 C.F.R. § 424.11(b), (c).  The Service may not add or remove a species from the list based on other information.  *See, e.g.*, *Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739, 747 (W.D. Tex. 1997).  The Eleventh Circuit has pointed out that the 1982 amendments to the ESA were intended to "insulate" the listing decision from the other factors, such as economic considerations, that go into a critical habitat designation.  *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1266 (11th Cir. 2007).  "Congress wanted 'to *prevent* [habitat] designation from influencing the decision on the listing of a species.'"  *Id.* (quoting H.R. Rep. No. 97-567, at 12 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807).  The fact that critical habitat was never designated for the Warbler is irrelevant to the listing or delisting decision.

Finally, Plaintiff incorrectly infers that a lack of designated critical habitat means that the Warbler does not face significant habitat threats that support the listing of the species.  The designation of critical habitat is based on numerous factors that are not part of the listing analysis.  For instance, the statute explicitly provides for the designation of critical habitat only to the extent it is "prudent and determinable" and requires the Service to consider "the economic impact, the impact on national security, and any other relevant impact" when making a designation.  16 U.S.C. §1533(a)(3)(A), (b)(2).  In other words, a critical habitat determination is based on information that cannot be considered for a listing determination.  *See, e.g.*, *New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1284-85 (10th Cir. 2001) (holding that the ESA "clearly bars" certain considerations, such as economic impacts, from "having a seat at the table when the listing determination is being made," but requires the Service to consider economic impacts for a critical habitat designation); *Alabama-Tombigbee Rivers Coal.*, 477 F.3d at 1266.

Here, the Service decided in 1990 that critical habitat was "undeterminable," 55 Fed. Reg. at 53,156, and later found that designating critical habitat for the Warbler was "neither necessary nor prudent," AR 25 (citing a 1994 letter from the Secretary of the Interior to the Governor of Texas). The fact that designating critical habitat was deemed to be undeterminable and subsequently not prudent does not contradict or call into question the Service's well-grounded and consistent scientific determinations that the Warbler faces serious habitat threats. *See* 55 Fed. Reg. at 53,156-59; AR 441-443; AR 449; AR 6782-84.

### C.   The Service Rationally Concluded That the Petition to Delist Did Not Present Substantial Information Indicating that Delisting May Be Warranted.

Listing a species as endangered or threatened may be based on any one of the five listing factors. 50 C.F.R. § 424.11(c) ("A species shall be listed or reclassified if the Secretary determines . . . that the species is endangered or threatened because of any one or a combination of the following factors."). A species reaches "recovery" when there has been "improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in [16 U.S.C. § 1533(a)(1)]." *Id.* § 402.02. Therefore, delisting can only occur when those five factors, viewed separately and cumulatively, do not cause the species to be in danger of extinction throughout all or a significant part of its range now or in the foreseeable future. *Id.* § 424.11(d). The burden is on the petitioner to submit substantial information addressing each of these factors and indicating that delisting the species may be warranted. *See* 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b); *W. Watersheds Project*, 2007 WL 2827375, at *2.

In 2014, the Service surveyed the best available science and completed a five-year review on the golden-cheeked warbler, which concluded that the Warbler was still "in danger of extinction throughout its range" and should remain listed as an endangered species. AR 6789. Less than a year after this thorough review, the Service received the Petition to Delist. The Petition primarily

16

cited scientific information available to the Service during its five-year review and already analyzed by the Service in that review.  As the ESA allows, the Service examined the evidence presented by the Petition to Delist and reviewed its own files, including the recent five-year review and the scientific information it was based on.  The Petition addressed four of the five delisting factors that the Service must consider under the ESA.  *See* 16 U.S.C. § 1533(a)(1).  The remaining delisting factor, Factor B, was not addressed, but the Service agrees that it does not pose a threat to the Warbler.  AR 440.  Each of the other four factors is addressed below.  Looking at this information as a whole, the Service exercised its scientific expertise and rationally concluded that a reasonable person would find that the Petition did not provide substantial information indicating that delisting the Warbler may be warranted.

>        1.        **Factor A – Present or Threatened Destruction, Modification or Curtailment of the Species' Habitat.**

The Petition to Delist admitted that golden-cheeked warblers have specific habitat needs, noting that the Warbler "nests in tall, closed canopy stands of Ashe juniper mixed with a variety of oak, maple, and other trees."  AR 8.  During the breeding season, when the Warbler resides in central Texas, Warblers "require shredded bark from mature Ashe juniper (Juniperus ashei) for nest material and a combination of Ashe juniper, oaks, and associated hardwoods for nesting and foraging."  AR 8.  Indisputably, the Warbler's survival depends on the continued existence of mature Ashe juniper-oak woodlands in central Texas.

The Warbler was listed as an endangered species and remains listed today because it has unique and particular habitat needs and faces habitat destruction and increasing habitat fragmentation that likely affects the Warbler's future existence.  55 Fed. Reg. at 53,156-59; AR 442-443; AR 6782-6783.  The Petition to Delist did not provide substantial information calling into question the major habitat threats faced by the Warbler.  In fact, the Petition to Delist did not

genuinely dispute the existence of these threats.  Instead, the Petition to Delist rests primarily on studies suggesting that the size of the Warbler population and the amount of potential habitat available for the Warbler are greater than the Service estimated when listing the Warbler in 1990. The Service acknowledged the increased estimated population size and range in the 2014 five-year review and the 90-day Finding, but nevertheless concluded that the Warbler faces serious habitat threats that place the Warbler in danger of extinction.  Because the Petition to Delist did not raise any doubt about the existence of these serious habitat threats, the Service rationally concluded that the Petition failed to present substantial information indicating that delisting the Warbler may be warranted.

> **a.** **The Petition Did Not Present Substantial Information Discounting Major Habitat Threats to the Warbler.**

One of the primary threats facing the Warbler is habitat loss.  Historically, habitat loss was due to widespread clearing of juniper, but more recently has been caused by rapid suburban and urban development.  AR 6782-6783.  Citing Duarte et al. (2013), the five-year review stated that an estimated 29% of Warbler breeding season habitat was lost between 1999-2001 and 2010-2011. AR 6782; *see also* AR 446 (same information in the 90-day Finding); AR 1921 (Duarte et al. (2013)).  The 90-day Finding further noted that the human population had increased by nearly 50% in the Warbler's breeding range between 1990 and 2010 and is anticipated to continue growing at a fast rate.  AR 443; AR 2522-2523 (Groce et al. (2010) documenting increased urbanization and human population growth in the Warbler's breeding range).  The Petition to Delist did not present any information suggesting that habitat loss is not a significant threat to the Warbler.  The Petition's only mention of habitat loss cited Groce et al. (2010) for the proposition that there was a net loss of roughly 116,549 hectares of woodland within the Warbler's breeding range between

1992 and 2001, with the highest rate of woodland loss near urban areas.  AR 2520.[5]  This loss of woodland *supports* the Service's conclusion that habitat loss, particularly due to development and urbanization, is a threat to the Warbler.

Habitat fragmentation poses another significant threat to Warbler persistence that the Petition to Delist did not meaningfully refute.  Fragmentation results in smaller patches of suitable Warbler habitat and greater edge-to-area ratios, which can expose Warblers to predators and other disturbances.[6]  AR 6783.  As the 90-day Finding pointed out, the Petition to Delist "fail[ed] to articulate whether or not habitat fragmentation is a significant threat to the warbler."  AR 443.  In fact, much of the evidence cited in the Petition to Delist *supports* the Service's conclusion that habitat fragmentation is a significant threat to the Warbler.  *See* AR 29-30.  The Petition stated that range-wide studies "indicate that the predicted probability of occupancy increases . . . with increasing patch size and mean percentage of woodland cover in the surrounding landscape."  AR 29-30 (citing Collier et al. (2012)).  The Petition also stated that "pairing and fledging success increased with increased patch size."  AR 30 (citing Coldren (1998)).

The other information regarding habitat fragmentation in the Petition to Delist was inconclusive, at best, and did not refute the wide-spread consensus that habitat fragmentation harms the Warbler's recovery and remains a significant threat.  The Petition cited studies indicating

---

[5] In fact, Groce noted that the actual impact of this woodland loss on Warblers could be even greater than those numbers suggest, because those numbers counted the net conversion of all woodlands and not just the mature Ashe juniper-oak woodlands preferred by the Warbler.  AR 2520.  The increase in woodland that was factored into these net conversion numbers likely included relatively young woodland stands that would not have the mature juniper necessary for Warbler nest building.  AR 2520; *see* 2467-2468 (noting that it may take 20-50 years for an area to develop into the mature woodland preferred by the Warbler).

[6] "[A] patch is a relatively homogenous area that is distinct from its surroundings," and for purposes of the studies cited generally means an area of potential Warbler habitat.  AR 2469.

that some warblers have established territories in small patches, such as 2.6 or 13 hectares, and the minimum patch size for successful Warbler reproduction was estimated at 16-18 hectares in rural areas or 20 hectares in urban environments.  AR 30.  However, the petitioners explicitly recognized that evidence of some breeding in small patches "does not discount the impact of habitat fragmentation on warbler success."  AR 116.

While the Service agreed with the Petition's conclusion that all patches—both large and small—are important because they provide potential habitat for the Warbler, the Service noted that numerous studies, including those relied upon by the Petition, have concluded that larger, more connected habitat patches are especially important because they are more likely to support high Warbler occupancy.  AR 443 (citing Collier et al. (2010), McFarland et al. (2012), Duarte et al. (2016)); AR 448 (citing Collier et al. (2011), Peak (2007), and Peak and Thompson (2014)); *see also* AR 6783 (five-year review stating that "the fragmentation of large blocks of breeding habitat can reduce occupancy and breeding success" (citing Peak (2007), Groce et al. (2010), DeBoer and Diamond (2006))).  The Service pointed out that Duarte et al. (2016), cited in the Supplement to the Petition, AR 116, "found that significant losses of warbler breeding habitat have occurred over the past decade, warbler habitats are far more likely to be diminished than regenerated, . . . and concluded that the conservation of large blocks of habitat is especially important for ensuring the long-term viability of the species."  AR 443; *see* AR 331-334.  Duarte et al. (2016) reflects the widely accepted notion that "large-scale habitat loss and fragmentation have continued to occur across the species' breeding range" and concluded that "any *change* in the listing status of the species based on these projections is *not* warranted."  AR 327, 334 (emphasis added); *see also* AR 2470-71 (Groce et al. (2010)); AR 3579-80 (Mathewson et al. (2012)); AR 3914 (Peak and Thompson (2013)).

Plaintiff's summary judgment brief raises arguments regarding habitat fragmentation that were never mentioned in the Petition to Delist, and therefore cannot be considered by the Court. In rendering its 90-day Finding, the Service was only obligated to review the information and narrative explanation presented in the Petition. *See* 50 C.F.R. § 424.14(b)(1), (2)(ii); *Wildearth Guardians*, 2011 WL 1225547, at *4 (petitioners have the burden of presenting substantial information "within the four corners of their petition"). The 90-day Finding is not intended to be a lengthy or comprehensive review of a species' status but merely an evaluation of whether the petition provides substantial information to warrant the start of a full status review. *See Colo. River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 176 (D.D.C. 2006) (90-day finding is a "threshold determination" based on what the petition actually presents to the agency). Therefore, the Service has no obligation to refute evidence that was not clearly presented in the Petition.

For instance, Plaintiff's brief relies on Reidy et al. (2015), AR 4448-4465, a study never cited in the Petition, for the proposition that Warblers are found in urban areas. Pl.'s Br. at 27-28. Plaintiff also fails to mention that Reidy et al. (2015) found that Warbler density was strongly influenced by canopy cover, patch size, fragmentation, and urban land cover, concluding that increased urbanization is likely to have a more pronounced negative effect on Warblers in the future. AR 4448, 4458-60. Plaintiff then cites Reidy et al. (2009) and Coldren (1998) for propositions not mentioned or even hinted at in the Petition. Pl.'s Br. at 28. Plaintiff's characterizations of those studies are also incomplete and misleading. Reidy et al. (2009) did not show "that urbanization is not harming Warbler survival," Pl.'s Br. at 28; rather, it determined that large (>100 ha), non-fragmented preserves in areas that are otherwise urban can support successful Warbler populations, but that fragmentation increases harmful edge effects on Warbler survival. AR 4466-4472. Coldren (1998) too found that larger patch sizes and distance from forest edge

increased pairing and reproductive success, and determined that Warblers selected against commercial development, entertainment, high-density transportation, and utilities in territory placement. AR 1441, 1529. Plaintiff's brief also cites Russell (2002), Russell (2004), Andruk (2014), Anders (2000), Pruett (2014), DeBoer (2006), the City of Austin (2011, 2012, and 2013), Magness (2006), and McFarland (2012) for arguments relating to fragmentation that were never presented in the Petition, and therefore cannot support its claim that it was unreasonable for the Service to find that the petition did not present substantial information indicating that the petitioned action may be warranted. Pl.'s Br. at 29-32. Many of these arguments in Plaintiff's brief also take the actual statements in the studies out of context or are misleading.

In sum, the Petition to Delist did not present any information, let alone "substantial" scientific information, indicating that habitat loss and fragmentation are not significant threats to the Warbler's survival now or in the foreseeable future. Nor could it, since the overwhelming scientific consensus, recognized in many of the studies relied upon by Plaintiff, is that these *are* serious threats that put the Warbler in danger of extinction. Reviewing the Petition, the five-year review, and the information in the Service's files led the Service to reasonably conclude that the Petition did not call into question the presence or impacts from these serious habitat threats and therefore did not present substantial information indicating that delisting may be warranted.

### b. The Petition's Arguments on Total Warbler Population Did Not Rise to the Level of Substantial Information Indicating that Delisting May Be Warranted.

Instead of addressing the serious habitat threats, the Petition to Delist rested largely on recent estimates of total population size and total potential habitat for the Warbler. The Service reviewed these studies, credited them as representing at least one approach in an area of scientific uncertainty, and determined that these studies, even if accurate, did not provide substantial

information that would lead a reasonable person to conclude that the delisting of the Warbler may be warranted.  This finding was entirely reasonable.

Population numbers, alone, do not determine whether a species is "endangered" or "threatened" under the ESA.  *See* 16 U.S.C. §§ 1532(6), (20), 1533(a)(1), (b)(1)(A).  Rather, the ESA requires the Service to look at threats under the five factors and determine whether those threats put the species in danger of extinction or likely to become so in the foreseeable future. While population levels may have some role in determining whether a species faces threats that warrant listing or delisting, the ESA is not set up as a mathematical formula with a certain threshold population size to determine whether a species should be listed.  Additionally, the mere fact that a population is larger than the agency thought at some previous point in time does not mean that the population is sufficiently large to withstand the threats that it faces.  The 90-day Finding and five-year review took into account the population and habitat range estimates cited in the Petition to Delist, and although these estimates were higher than the estimated population and habitat size at the time of the 1990 listing, the Service concluded that the Warbler still faces significant threats that placed it in danger of extinction throughout all of its range.  AR 441-442, 449, 6779, 6781, 6789.

Contrary to Plaintiff's claims, the 90-day Finding did not summarily dismiss the 2015 conservation status review conducted by the Texas A&M Institute of Renewable Natural Resources ("Texas A&M Review"), AR 86-106, or any of the scientific studies relied upon in the Petition to Delist.  *See* Pl.'s Br. at 26.  As the 90-day Finding explained, the Texas A&M Review— which is an unpublished survey of existing research—"summarizes information already known to the Service and discussed in the 5-year review."  AR 442.  Plaintiff points to the Service's statement that "the modeling studies described in the 2015 Texas A&M Study do represent the

most recent and comprehensive efforts to estimate range-wide warbler habitat and population size to date," Pl.'s Br. at 26 (citing AR 442), as alleged proof that the five-year review, conducted before the Texas A&M Review was released, does not represent the best available science. However, this is misleading. Although the Texas A&M Review itself was not released until after the five-year review, the "modeling studies" relied upon by Texas A&M and mentioned in the 90-day Finding *were* available at the time of the five-year review. For instance, the Texas A&M Review heavily relied upon Mathewson, which was analyzed and discussed in the five-year review. *See* AR 93 (Texas A&M Review relying primarily on Mathewson et al. (2012) as the most recent estimate of Warbler population size); AR 6779 (discussion of Mathewson et al. (2012) in the five-year review). The Texas A&M Review did not conduct its own study or generate any new data regarding the Warbler. Thus, the 90-day Finding correctly pointed out that the Texas A&M Review did not provide any *new* substantial scientific information supporting the delisting of the Warbler that had not been previously reviewed by the Service.

Similarly, the Morrison et al. (2012) literature review paper did not provide any new data, but merely summarized existing studies on the Warbler. *See* Pl.'s Br. Appendix, ECF No. 64-1.[7] Thus, the fact that Morrison et al. (2012) was not specifically addressed in the five-year review or 90-day Finding does not mean that the Service ignored or discounted relevant scientific information. *See* Pl.'s Br. at 13.

The Petition to Delist relied heavily on recent estimates of Warbler population size and potential habitat area from Mathewson et al. (2012), which was also the primary study cited for

---

[7] Morrison et al. (2012) was mistakenly left off of the Index to the Administrative Record and not labeled with Bates numbers. The study was included on the Administrative Record CD in a file entitled "Morrison et al Paradigm 2012 Wildlife Society Bulletin.pdf." For ease of reference, Federal Defendants will cite to the copy of this article attached to Plaintiff's brief, ECF No. 64-1.

the high end of population and habitat estimates in the Texas A&M Review and Morrison et al. (2012).  *See* AR 7, 17-18; AR 93; ECF No. 64-1 at 3.  Mathewson "relied on a range-wide model predicting patch level occupancy" developed in Collier et al. (2012).  AR 3580.  The Service noted that other studies "cautioned that this analysis may have over-predicted density estimates, resulting in inflated population estimates."  AR 6779; *see* AR 4550, 4553, 4556, 4558 (City of Austin monitoring on BCP found significantly fewer male Warblers than the Morrison et al. (2012) study would estimate).  The 90-day Finding also cited a recent study indicating that similar modeling techniques tended to overestimate plots with lower known Warbler densities.  AR 442.  Additionally, the Mathewson study itself admitted it used a "liberal estimation of habitat," which included "habitat often assumed as lower quality."  AR 3588.  Mathewson noted that 59% of the habitat patches in its study (and Collier et al. (2012)) had less than a 10% probability of occupancy by Warblers.  AR 3588.  These admissions indicate that the total potential habitat estimate used in these studies is not a reliable indicator of actual Warbler habitat, and overestimated habitat area may have had some effect on the total population size estimates.  AR 3588.

Despite the signs that the Mathewson study may be unreliable, the Service did not ignore or fully discount this study or the related studies using the same methodology.  The Service instead concluded that these new estimates of population and potential habitat range simply were not enough to indicate that delisting the Warbler may be warranted.  First, the Service noted that these estimates used a new methodology, and therefore cannot indicate "positive trends" in warbler habitat or population size.  AR 442.  Second, the Service "acknowledge[d] that the known potential range is geographically more extensive than when the golden-cheeked warbler was originally listed," but noted that the "threats described in the original listing rule remain and recovery criteria have not been accomplished."  AR 442.  In other words, even if the Warbler population was greater

than originally estimated, the population is still reliant on a particular habitat type found only in a portion of Texas that faces ongoing threats of "destruction, fragmentation and degradation."  AR 442.  These studies do not change the fact that if the species is delisted and its essential breeding habitat is destroyed, the Warbler faces a significant risk of extinction.  The Service properly exercised its scientific judgment and provided factual support for its determination that these increased population and habitat size estimates alone would not convince a reasonable person that the Petition presented substantial information that delisting of the Warbler may be warranted— particularly in light of the well-documented habitat threats faced by the Warbler.

Plaintiff asserts that these higher population estimates mean that the recovery criteria for the Warbler have been met.  Pl.'s Br. at 27.  As an initial matter, the recovery criteria do not replace the statutory standard for delisting a species.  *See* 16 U.S.C. §§ 1532(6), (20), 1533(a)(1), (b)(1)(A).  Thus, the Service may not delist a species that meets the definition of a "threatened" or "endangered" species regardless of whether the recovery criteria have been met.  Further, the Warbler has not met the recovery criteria laid out in the 1992 Recovery Plan.  Plaintiff misinterprets the recovery criteria established by the Service to determine when the Warbler will achieve recovery.  The Recovery Plan lists five criteria for recovery, *see* AR 7076, and the five-year review found that "[a]lthough progress has been made towards these criteria, none have been achieved to date."  AR 6778.  To consider delisting the Warbler, the Service must find (among other things) that "sufficient breeding habitat has been protected to ensure the continued existence of at least one viable, self-sustaining population in each of eight regions" and has "been maintained for at least 10 consecutive years."  AR 7076.  The five-year review reiterated that "permanent protection of large blocks of contiguous habitat is necessary for the long-term survival and recovery of the [Warbler]" and "[e]nough habitat should be protected in the breeding, migrating,

and wintering habitat to support viable [Warbler] populations." AR 6790. The five-year review also stated that habitat management was needed throughout the range "such that woodland and forest regeneration occurs and persists over the long term." AR 6790. The Petition to Delist did not provide evidence that this criterion has been achieved, i.e. that sufficient habitat has been protected to ensure the continued existence of viable, self-sustaining populations of Warblers throughout the breeding range.

Instead, Plaintiff relies upon the Recovery Plan's estimate that the delisting criteria would be met by 2008. *See* Pl.'s Br. at 27; AR 7034. This was an educated guess made by the Service in 1992, based upon the then-current information, predictions about the future, and the assumption that the plan would be fully funded and implemented. This estimate in no way suggests that the Service was obligated or required to delist the Warbler by 2008. To the contrary, the Warbler can only be delisted when it meets the ESA standard, regardless of how long that may take. *See* 16 U.S.C. § 1533. The significant loss of habitat and habitat fragmentation that has occurred since 1992 undoubtedly played a role in the Warbler's failure to achieve recovery by 2008.

Plaintiff also misinterprets the Beardmore et al. (1995) Population and Habitat Viability Assessment. Pl.'s Br. at 27. The Beardmore Assessment sought to determine what would constitute a "[v]iable, self-sustaining population" in each of the eight recovery regions, as provided for in the Recovery Plan. AR 984; *see also* AR 7071 (defining "population" as a geographically delimited set of organisms capable of freely interbreeding with one another under natural conditions). The Beardmore Assessment recommended that a viable population contain 3,000 breeding pairs of golden-cheeked warblers on roughly 32,500 acres of "good quality" and "sufficiently unfragmented" habitat. AR 984. A population of this size would be necessary in *each* of the eight recovery regions to achieve the recovery criterion. The Petition to Delist did not

27

provide evidence that an interbreeding population of 3,000 breeding pairs of Warblers on 32,500 acres of good quality, unfragmented habitat exists in each of the eight recovery regions.  In fact, Alldredge (2004), cited by the Petition to Delist, AR 22, determined that there were only two patches with carrying capacities sufficient to meet the Beardmore Assessment's recommendation. AR 535; Pl.'s Br. at 27.

The Service rationally concluded that the population data presented in the Petition to Delist was not substantial information indicating that delisting may be warranted.

### 2.    Factor C – Disease or Predation

The Petition also did not provide substantial information that disease and predation are not threats to the golden-cheeked warbler.  *See* 16 U.S.C. § 1533(a)(1)(C).  The Service considers predation to be a "moderate threat" that, when considered cumulatively with habitat destruction and fragmentation under Factor A and other threats, supports the finding that Warblers are still in danger of extinction.  AR 445.  The Service does not consider disease to be a significant threat to the species.  AR 445.

The Petition to Delist admits that "snakes, birds, mammals, and red-imported fire ants" are all "[d]ocumented warbler predators."  AR 24 (citing studies).  Reidy (2009), which studied nighttime predation of adult female Warblers by snakes and was cited by the Petition at AR 24, estimated that 14.6% of breeding females were depredated on the nest and "[p]redation of nesting females is potentially an important source of mortality for Golden-cheeked Warblers."  AR 4483. The Petition also cited Stake et al. (2004), AR 5826-5833, for the proposition that "the height of warbler nests reduce[s] the risk of fire ant predation and that warblers are not the main target of other birds or mammals."  AR 24.  The fact that some predators have other targets besides the Warbler does not discount the risk of predation.  And although Stake et al. (2004) found that fire

28

ants only preyed on one nest in their Fort Hood study, the overall result was that "[p]redators depredated 34 of 155 eggs monitored (22%) and 50 of 206 nestlings monitored (24%)"—indicating that predators are a significant barrier to Warbler breeding and fledging success.  AR 5828, 5830.

With regard to parasitism by the brown-headed cowbird, the Petition to Delist also cited Groce et al. (2010) as stating that brood parasitism is a small risk to overall warbler nest survival. AR 24.[8]  This is at least an over-simplification, if not a mischaracterization: Groce noted that many consider cowbird parasitism a "minor threat" to Warblers and documented that cowbird parasitism rates in Warbler nests ranged from 8.3 to 57.6%, depending on study site and year.  AR 2465.  The Petition also cites Anders (2000), AR 640-654, as recording no evidence of brood parasitism by cowbirds in a study conducted within Fort Hood.  AR 24.  The Petition fails to mention that Anders explained "[a] cowbird control program has been in place on Fort Hood since 1988," but in areas without such effective cowbird control "[g]olden-cheeked warblers are susceptible to brood parasitism by cowbirds."  AR 647.  Thus, Anders does not discount the threat of cowbird parasitism in the vast majority of Warbler habitat.

Plaintiff's brief also relies on Stake (2003), an unpublished master's thesis, and Butcher et al. (2010), two studies not cited by the Petition to Delist for any proposition relating to predation. Pl.'s Br. at 35; AR 5752-5825.  As explained above, the Service had no obligation to respond to arguments or information not presented in the Petition to Delist.  In total, the information cited by the Petition to Delist regarding predation, at most, established that when certain predators' effects on Warblers were viewed in isolation, the threat from any particular predator could be viewed as

---

[8] Brood parasitism refers to when the brown-headed cowbird lays its own eggs in the nest of another species, sometimes accompanied by active predation of the existing eggs or nestlings.  The cowbird nestlings often hatch earlier and grow faster than the original nestlings, giving them a competitive advantage that can cause death of the other species' nestlings.  AR 2463.

minor.  It did not present any information, let alone substantial information, that predation as a whole is not a threat to the Warbler.

Contrary to Plaintiff's accusations, the Service relied upon more than a mere list of animals that prey on Warbler nests to support its finding that predation is a threat to the Warbler.  *See* Pl.'s Br. at 34.  The Service relied upon six different scientific studies showing that this predation occurs and is potentially increasing due to fragmentation, which creates more edges on Warbler habitat patches and may allow easier access for predators.  AR 445; AR 6785.  Each of these studies provides scientific support for the Service's findings.  *See, e.g.*, AR 3902 (Peak et al. (2007)); AR 790 (Arnold et al. (1996) finding that "Warbler nests located near habitat edges may have a slightly greater risk of nest predation than nests located within habitat interiors"); AR 4470 (Reidy et al. (2009) concluding that "higher abundance of predators in fragmented landscapes and higher predator activity near edges contributed to lower nest survival near edges").

In sum, the Service relied upon numerous studies indicating that predation is a moderate threat to the Warbler.  Meanwhile, the Petition acknowledged that predation occurs and put forth no evidence that predation as a whole does not have a significant negative effect on Warbler survival and breeding success, particularly when considered in combination with the other threats to the species.  The Service therefore reasonably concluded that the Petition to Delist did not present substantial information casting doubt on the numerous studies indicating that the threat of predation contributes to a determination that the Warbler warrants listing.

### 3.  Factor D – Existing Regulatory Mechanisms

The Petition also failed to provide substantial evidence that adequate regulatory mechanisms exist to protect the Warbler if it were delisted.  First, the Petition cited the Migratory Bird Treaty Act and the Texas Endangered Species law as existing regulatory mechanisms that

would sufficiently protect the Warbler.  AR 25-27.  These laws provide some protection to the Warblers themselves by making it illegal to capture, take, or kill golden-cheeked warblers.  *See* AR 25-27; 16 U.S.C. § 703(a); 5 Tex. Parks & Wildlife Code § 68.015.  However, the 90-day Finding explained that neither of these regulatory mechanisms "prohibits habitat destruction, which is an immediate threat to the warbler."  AR 445; AR 6786.

Plaintiff incorrectly asserts that habitat destruction is not a valid concern because the Service has not designated critical habitat for the Warbler.  Pl.'s Br. at 35.  However, the Warbler's listing, even without designated critical habitat, provides significant protection to Warbler habitat that would be lost if the species were removed from the endangered species list.  First, Section 7 of the ESA requires federal agencies to ensure that agency actions are not likely to jeopardize the continued existence of the Warbler, including through actions that would damage a species' habitat to the point of causing jeopardy.  16 U.S.C. § 1536(a)(1), (2).  Section 7 requires federal agencies to consult with the Service on any federal action that may adversely affect the Warbler, including through habitat effects, and permits the Service to suggest reasonable and prudent alternatives to any federal agency action that the Service determines is likely to jeopardize the Warbler.  *Id.* § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(a), (b)(1).  Additionally, Section 9 of the ESA bars any person from committing a "take" of an endangered species, which includes actions that "harm" the species.  16 U.S.C. § 1538; *id.* §1532(19).  For purposes of the ESA, "harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3; *see also Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Ore.*, 515 U.S. 687, 700-01 (1995) (upholding this definition of harm that includes "habitat modification").  This Circuit has held, in contrast, that "a 'taking' [under the Migratory Bird Treaty Act] is limited to deliberate acts

31

done directly and intentionally to migratory birds." *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 488-89 (5th Cir. 2015). Moreover, a number of courts have held that "take" under the Migratory Bird Treaty Act does not incorporate indirect harm through habitat modification. *See Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 303 (9th Cir. 1991) ("Habitat destruction causes 'harm' to the [species] under the ESA but does not 'take' them within the meaning of the [Migratory Bird Treaty Act.]"); *Newton Cty. Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110 (8th Cir. 1997); *Mahler v. U.S. Forest Serv.*, 927 F. Supp. 1559 (S.D. Ind. 1996); *Curry v. U.S. Forest Serv.*, 988 F. Supp. 541, 549 (W.D. Pa. 1997).[9]

In fact, Plaintiff admits that the listing of the Warbler, even without any critical habitat designated, provides protection to Warbler habitat. Plaintiff claims that it owns land containing large amounts of Warbler habitat and that, due to ESA protections, it may not develop that land without mitigating any habitat damage. *See* Pl.'s Br. at 18. Plaintiff admits that harming Warbler habitat would "risk[] an enforcement action by the Service or a citizen suit alleging incidental take of Warblers" under Section 9 of the ESA, unless Plaintiff sought an incidental take permit from the Service. Pl.'s Br. at 19. Plaintiff alleges that its injury—i.e. not being able to destroy Warbler habitat without risking illegal take—is caused by the Warbler's listing under the ESA and would be redressed if the agency took steps to delist the Warbler. *Id.* at 20-21. Clearly, existing regulatory mechanisms other than the ESA would not stop a private or state entity from destroying Warbler habitat.

---

[9] Plaintiff's argument that the Migratory Bird Treaty Act provides sufficient protection for the species would mean that no migratory birds should ever be listed under the ESA. That would severely limit the ESA and is inconsistent with decades of agency practice.

The remaining "regulatory mechanisms" cited in the Petition include the existence of the Balcones Canyonlands National Wildlife Refuge,[10] the Recovery Credit System developed by the Texas Department of Agriculture to provide technical assistance to landowners near Fort Hood who voluntarily participate, guidance for brush clearing in Warbler habitat subject to certain federal contracts, a voluntary international cooperative partnership to protect pine-oak forests in Central America, and the existence of habitat conservation plans created under the ESA.  AR 27-29.  Plaintiff alleges that the fact that some of these issues were discussed in a different section of the five-year review somehow precludes the 90-day Finding from determining that existing regulatory mechanisms are inadequate to protect the Warbler.  Pl.'s Br. at 36.

This argument elevates form over substance.  The 90-day Finding, which is the document actually under review in this case, considered the alleged "regulatory mechanisms" cited in the Petition in its Factor D analysis.  AR 445-446.  Therefore, it is irrelevant where these issues were discussed in the five-year review.  But even if it were relevant, Plaintiff's argument that the Service erred in failing to discuss these mechanisms in the "Factor D" discussion of the five-year review is misplaced.  The ESA does not define "regulatory mechanisms," but courts have held that the term includes binding laws or regulations and certain other conservation agreements that the Service reasonably concludes are more than a mere speculative promise of future action.  *See Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1082-84 (D.C. Cir. 2017).  It is not clear that the existence of protected land or availability of information regarding habitat management for certain narrow categories of landowners are "regulatory mechanisms" under the Act.  Therefore, the five-year

---

[10] As noted in the 90-day Finding, it is unclear whether the Petition to Delist was referencing the Balcones Canyonlands National Wildlife Refuge, a federal land unit, or the Balcones Canyonlands Preserve, which is managed under a regional habitat conservation plan.  AR 446.

review reasonably considered the benefits of the protected lands in its analysis of the magnitude of habitat threats under Factor A and did not repeat that analysis under Factor D.  AR 6784.

The 90-day Finding explained that despite the existence of some protected land for the Warbler, an estimated 29 percent of existing breeding season habitat was lost between 1999-2001 and 2010-2011.  AR 446 (citing Duarte et al. (2013), AR 1921).  Clearly, the existing wildlife preserves and habitat conservation plans have not prevented the ongoing destruction and fragmentation of Warbler habitat.  It was entirely reasonable for the Service to conclude that, without the protections of the ESA, Warbler habitat destruction will continue with fewer legal constraints and it is likely to increase.  *See* AR 446.

Moreover, the Petition to Delist presumes that the habitat conservation plans and existing federal and state conservation efforts would all remain in effect regardless of whether the Warbler was listed under the ESA—which is certainly not guaranteed.  As explained above, without the ESA listing private, state, and federal entities will all have reduced incentives to protect the Warbler in the future.  Habitat conservation plans, for example, are created to secure a Section 10 permit under the ESA permitting the incidental take of a listed species.  16 U.S.C. § 1539(a)(2)(A).  Participants must comply with the habitat conservation plan, and any details in their related incidental take permit, or risk liability for the take of endangered species under Section 9 the ESA.  *See* 16 U.S.C. § 1539(a)(1)(B).  If the Warbler were delisted, participants in the habitat conservation plans could ignore the management measures they agreed to without risking any legal liability and the Service would be unable to enforce the provisions of the plans.  Of course, if a landowner has already permanently set aside land in a manner that cannot be undone, that land preservation will continue regardless of delisting.  But other positive impacts from the habitat

34

conservation plans are likely to disappear and landowners who are not currently parties to a habitat conservation plan will have no reason to join one or develop their own plans.

The Petition to Delist did not point to any regulatory mechanisms that would protect Warbler habitat to a sufficient degree to ensure that the Warbler will not be in danger of extinction. The Service reasonably concluded that the Petition to Delist did not present substantial information regarding this factor that would indicate that the delisting of the Warbler may be warranted.

### 4.    Factor E – Other Natural or Manmade Factors

Under its section on Factor E, the Petition to Delist argued that habitat fragmentation was not a significant threat to the Warbler. AR 29-30.  Habitat fragmentation involves the destruction, modification, or curtailment of the species' habitat, which is covered by delisting Factor A, and therefore the Petition's arguments on these points are addressed in the Factor A section above.  *See supra* Section V(C)(1)(a).  The Petition also discussed oak wilt, wildfire, habitat management, and noise effects under Factor E.  AR 30-31.  The 90-day Finding agreed that noise was not a significant threat to the Warbler.  AR 448.  However, the Petition failed to provide substantial information indicating that the other natural and manmade factors may warrant delisting the species, in light of the other threats faced by the Warbler.

With regard to oak wilt—a fungal infection that affects oak species, AR 447— the Petition to Delist acknowledged studies showing that pairing success for male Warblers decreased substantially in areas suffering from oak wilt. AR 30 (citing Stewart et al. (2014), AR 5843-5851). Stewart et al. (2014) also found that "oak wilt frequently occurred in golden-cheeked warbler habitat" and predicted that oak wilt would affect almost twice as much habitat by 2018, "with the greatest increase in the areas with the highest probability of occupancy."  AR 5849; AR 30 (Petition to Delist noting this prediction that habitat affected by oak wilt would double by 2018).

35

None of the other scientific studies cited in the Petition questioned the general conclusion that oak wilt occurs in Warbler habitat and has the potential to negatively affect Warblers and their habitat. *See* AR 447; AR 6783; AR 2544-2545.

Nor did the Petition's arguments on other factors influencing Warbler habitat quality establish that the threats should not be considered under the ESA. The Petition noted that deer "can limit oak survival when the saplings are browsed," although it is unclear to what extent this practically has affected Warbler habitat. AR 30. The Petition also cited Yao et al. (2012), AR 7495-7506, for the proposition that fire "could have a dual effect on warbler habitat," reducing tree density which could reduce suitability for Warblers but, over the long term, promoting oak recruitment. AR 30. The 90-day Finding noted that wildfires have been shown to "significantly diminish occupancy by warblers in previously occupied habitat, and that effect can last for over a decade," consistent with the Petition's acknowledgement of harmful effects in the shorter term. AR 447; AR 4443 (Reemts et al. (2008)). The Petition also suggested that the vegetation management practice of thinning understory juniper improved fledging success in a study by Marshall et al. (2012). AR 31. The five-year review and 90-day Finding never asserted that the thinning of understory juniper was a substantial threat to Warblers. Other vegetation management practices such as the conversion of Warbler habitat to agricultural or other uses, unsustainable forestry practices, the extraction of timber, and clearcutting *are* recognized threats to the Warbler and were not directly addressed in the Petition. *See* AR 447-448; AR 6783.

Overall, the Service agreed with the petitioners that "there is some uncertainty regarding the magnitude of threats these activities present to warbler habitat quality (and thus, warbler reproductive success and survival)." AR 447. However, the ESA requires that, when deciding whether to list or delist a species, the Service must consider all potential threats, even those that,

viewed in isolation, have a relatively minor or uncertain effect.  The Petition did not provide substantial information that would lead a reasonable person to determine that "oak wilt, wildlife, vegetation management, and patch size are not threats to the species" such that delisting may be warranted.  AR 447.

The five-year review found that other natural and manmade factors affected the Warbler's continued existence in the foreseeable future, including climate change and recreation in Warbler habitat.  AR 6786-6788.  The Petition to Delist did not provide *any* evidence regarding the potential threat of climate change or recreation.  AR 448.  Therefore, the Service properly concluded that the Petition did not present substantial information indicating that these threats do not contribute to putting the Warbler in danger of extinction now or in the foreseeable future.[11]

## VI.    CONCLUSION

In conclusion, the Petition to Delist rested largely on population and habitat range data, which the Service had already analyzed in its five-year status review of the Warbler and determined did not warrant the delisting of the Warbler.  The Petition to Delist did not provide substantial information calling into doubt the Service's longstanding and consistent assessment that the Warbler faces serious habitat threats, and a variety of other threats, that cumulatively warrant the Warbler's listing as an endangered species.  In fact, the Petition conceded or did not refute the existence of most of the major threats facing the Warbler.  Looking at the information presented in the Petition regarding the five listing factors, and the information in the Service's own files, the Service rationally concluded that the Petition to Delist did not present substantial scientific information indicating that delisting the Warbler may be warranted.

---

[11] The Petition also failed to address the cumulative impacts of the threats to the Warbler.  *See* AR 448-449.

For these reasons, Plaintiff's motion for summary judgment should be denied, and Federal

Defendants' cross-motion for summary judgment should be granted.


Dated: June 29, 2018                          Respectfully submitted,

                                              JEFFREY H. WOOD
                                              Acting Assistant Attorney General
                                              U.S. Department of Justice
                                              Environment and Natural Resources Division
                                              SETH M. BARSKY, Section Chief
                                              MEREDITH L. FLAX, Asst. Section Chief

                                              */s/ Devon Lea Flanagan*
                                              DEVON LEA FLANAGAN
                                              Trial Attorney
                                              D.C. Bar No. 1022195
                                              Wildlife and Marine Resources Section
                                              Ben Franklin Station
                                              P. O. Box 7611
                                              Washington, D.C.  20044-7611
                                              (202) 305-0201 (tel.)
                                              (202) 305-0275 (fax)
                                              devon.flanagan@usdoj.gov

                                              CHARLES K. COOPER
                                              Assistant United States Attorney
                                              Texas Bar No. 24074070
                                              816 Congress Avenue, Suite 1000
                                              Austin, Texas 78701
                                              (512) 916-5858 (phone)
                                              (512) 916-5854 (fax)
                                              charlie.cooper@usdoj.gov

                                              *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Texas by using the CM/ECF system, which will serve a copy of the same on the counsel of record.

*/s/ Devon Lea Flanagan*
DEVON LEA FLANAGAN
Trial Attorney
D.C. Bar No. 1022195
Wildlife and Marine Resources Section
Ben Franklin Station
P. O. Box 7611
Washington, D.C.  20044-7611
(202) 305-0201 (tel.)
(202) 305-0275 (fax)
devon.flanagan@usdoj.gov

*Attorney for Defendants*