UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| GENERAL LAND OFFICE OF THE STATE OF TEXAS,<br>    *Plaintiff,*<br><br>v.<br><br>UNITED STATES FISH & WILDLIFE SERVICE, et al.<br>    *Defendants.* | No. 1:17-cv-00538-SS |

**BRIEF OF AMERICAN STEWARDS OF LIBERTY AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**INTEREST OF AMICUS CURIAE**

American Stewards of Liberty ("ASL") appears as amicus curiae to ensure that the implementation of the Endangered Species Act ("ESA") is based upon robust, current, and principled scientific information and analysis by the U.S. Fish and Wildlife Service ("Service"). ASL is a 501(c)(3) charitable organization whose members in Central Texas and across the southern and western United States have a fundamental interest in their ability to use their working farming and ranchlands productively and free from regulation under the ESA where such regulation is unsupported by law. So long as the Service's list of endangered and threatened species continues to retain species that do not now meet the statutory criteria for such protection—including those that likely never did meet the criteria and were originally listed in error—citizens are required to bear the burden of unwarranted regulation negatively impacting their land use, which has substantial economic consequences for them and their communities. For this reason, ASL has been active in efforts to improve Service implementation of the ESA,

particularly the delisting of species for which the original listing was in error and the current data supports the conclusion that their continued listing under the ESA is not warranted. ASL has previously petitioned the Service to delist the Bone Cave harvestman ("BCH"), American burying beetle ("ABB"), Navasota ladies' tresses, and the western distinct population segment of the yellow-billed cuckoo. ASL is currently engaged in litigation to challenge the Service's negative 90-day finding on petition to delist the BCH. *American Stewards of Liberty, et al. v. U.S. Fish and Wildlife Serv., et al.*, No. 1:15-cv-01174-LY (W.D. Tex.). ASL is also currently litigating the Service's overdue 12-month finding on the petition to delist the ABB. *American Stewards of Liberty, et al. v. U.S. Dept. of the Interior, et al.*, No. 6:17-cv-00352-RAW (E.D. Okla.). ASL seeks to participate as amicus curiae in this case in order to preserve the integrity of the Service's analysis of delisting petitions, including the Service's analysis of current threats to species consistent with the ESA's statutory listing factors.

This brief seeks to assist the Court by providing a concise evaluation of the shortcomings in the Service's analysis of the scientific information presented in the petition to delist the golden-cheeked warbler ("Warbler"). ASL seeks to provide this informed analysis and critique of the flawed Service reasoning that underpins its arbitrary and capricious negative 90-day finding ("90-Day Finding") on the petition to delist the Warbler ("Petition to Delist") (AR 458).

## STATEMENT OF THE CASE

At issue is the Service's continued listing of the Warbler as an endangered species. Following the filing of the Petition to Delist under the ESA, the Service reached a negative 90-Day Finding based on its conclusion that the petition did not present substantial information indicating that the delisting of the Warbler may be warranted. AR 458. Specifically, the Service reached this preliminary negative finding because it found that the Petition to Delist did not

present substantial information not previously addressed in the Service's 2014 five-year status review of the Warbler ("Five-Year Review") or call into question the Service's conclusion in the Five-Year Review that the Warbler has not recovered. AR 449; AR 458. The Plaintiff in this case argues that the Service's negative 90-Day Finding (AR 458) was arbitrary and capricious and violated both the ESA, 16 U.S.C. § 1531, *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, by failing to reach a positive 90-day finding on the Petition to Delist based upon the substantial, new information provided in the petition. Dkt. 56. Plaintiff and Defendants have now filed cross-motions for summary judgment on this question of whether the Service was arbitrary and capricious in concluding that the Petition to Delist did not present substantial information indicating that delisting the Warbler may be warranted. Dkt. 61, 67.

## LEGAL AND STATUTORY BACKGROUND

ASL will not here provide a comprehensive statement of all applicable provisions of the ESA and its implementing regulations, but a concise restatement of the ESA regulations applicable to the Service's consideration of a petition to list, delist, or reclassify a species is central to the question of whether the Service's 90-Day Finding was arbitrary and capricious and not in accordance with the ESA.

ESA section 4 provides the Service with the authority to remove species from the list of endangered and threatened species, and the statutory criteria for whether a species warrants protection under the ESA apply equally whether the Service is deciding to list, delist, or revise a species' listing status. 16 U.S.C. §§ 1533(a)(1), (b)(3), (c)(2). The Service is required to make all determinations on a species' listing status "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(b). The ESA directs the Service to publish guidelines outlining the criteria for making findings on the petition of an

interested person to list, delist, or reclassify a species, and these regulations were revised in 2016. 16 U.S.C. § 1533(h)(2); Revisions to the Regulations for Petitions, 81 Fed. Reg. 66462 (Sept. 27, 2016) (codified at 50 C.F.R. § 424.14).  While the Service's 90-Day Finding was published on June 3, 2016—prior to the September 2016 publication of the final revised petition regulations—the Service used the term "new information" in the 90-Day Finding when defining the information standard by which such a petition is adjudged by the Service. AR 458. The concept of "new information" in the context of determining whether a petition meets the ESA's "substantial information" standard is notably absent from the ESA regulations in effect at the time of the 90-Day Finding and was only introduced by the then-proposed regulations that the Service finalized later that fall. Because the Service seemingly applied the then-proposed regulations when evaluating the Petition to Delist, and because the Service itself stated that the revised regulations were intended to heighten the information standards for petitions (81 Fed. Reg.at 66462), it is relevant that the Petition to Delist met even these heightened requirements, and the 2016 revised regulations should be considered by the Court in evaluating the reasonableness of the Service's negative 90-Day Finding.

The ESA requires delisting petitions to present "substantial scientific or commercial information indicating that the petitioned action may be warranted" in order for the Service to reach a positive 90- day finding on the petitioned action. 16 U.S.C. § 1533(b)(3). The revised regulations finalized by the Service in 2016 somewhat revised the definition of the "substantial information" standard, stating:

> [S]ubstantial scientific or commercial information" refers to credible scientific or commercial information in support of the petition's claims such that a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted. Conclusions drawn in the petition without the support of credible scientific or commercial information will not be considered "substantial information."

> . . .
>
> The "substantial scientific or commercial information" standard must be applied in light of any prior reviews or findings the Services have made on the listing status of the species that is the subject of the petition. Where the Services have already conducted a finding on, or review of, the listing status of that species (whether in response to a petition or on the Services' own initiative), the Services will evaluate any petition received thereafter seeking to list, delist, or reclassify that species to determine whether a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted despite the previous review or finding. Where the prior review resulted in a final agency action, a petitioned action generally would not be considered to present substantial scientific and commercial information indicating that the action may be warranted unless the petition provides new information not previously considered.

50 C.F.R. §§ 424.14(h)(1)(i), (ii). In the preamble to the 2016 final rule revising the requirements for ESA petitions, the Service reiterated that:

> In the case of prior reviews that led to final agency actions (such as final listings, 12-month not warranted findings, and 90-day not-substantial findings), a petition generally would not be found to provide substantial information unless the petition provides new information or a new analysis or interpretation not previously considered in the final agency action. By "new" we mean that the information was not considered by the Services in the prior determination or that the petitioner is presenting a different interpretation or analysis of the data.

81 Fed. Reg. at 66480. This "new information" standard—applicable only where the prior Service review resulted in a final agency action challengeable under the APA, 5 U.S.C. § 551 *et seq*.—is further clarified in the preamble, where the Service stated:

> In conducting status reviews, the Services may reevaluate data they already considered in previous status reviews. Petitioners may similarly present a new analysis of existing data in support of their requests, and the Services will evaluate such requests on that basis. A petitioned request could be based on discovery of an error in research regarding information previously considered by the Services.
>
> Unless such a petition provides different data, or a different analysis or interpretation of, or errors discovered in, the data, model or analytic methodology used in a previous finding, review, or determination, the conclusions may be the same, and the Services may find that such a petition does not provide substantial information indicating that the petitioned action may be warranted.
>
> We make the distinction that, in the case of prior reviews that led to final agency actions (such as final listings, 12-month not-warranted findings, and 90-day not-substantial findings), a petition would generally be presumed not to provide substantial information unless the petition provides new information or a new

> analysis not previously considered in the final agency action. On the other hand, if the previous status review did not result in a final agency action, the petition would not be required to overcome the presumption that, unless it includes information or analysis that was not considered in the previous status review, it generally will not present substantial information indicating that the petitioned action may be warranted.

*Id.* at 66474. Importantly, the Service further explained that, for example, a completed five-year status review is not a final agency action. *Id.* at 66480. Finally, the Service reiterated the relationship between the "new information" requirement and the judicial reviewability of final agency actions:

> This rule will not limit the ability to file delisting or other petitions. In cases where petitioners request an outcome that differs from the outcome reached in a previous Service finding or determination, the rule simply recognizes that the courts apply a presumption that agency actions are valid and reasonable, and therefore the petitioner should provide new or additional information or a new analysis not previously considered. We add this requirement [of new information or analysis] to prevent the petition process from being used inefficiently—in effect, to voice disagreement with a previous determination by one of the Services without providing any new information or analysis relevant to the question at issue, and instead of using the appropriate judicial forum to challenge the previous determination directly. An appropriate showing may include an explanation of how information used in the previous analysis was misused, misrepresented, or misinterpreted.

*Id.* Thus, it is only in the instance where a prior Service decision regarding a species' listing status is a final agency action challengeable under the APA that "new information" is required in a delisting petition. Further, the concept of "new information" includes new interpretations or analyses of already-considered information. *Id.* Therefore, where the Service simply completes a five-year status review that results in no final agency action, a delisting petition is not required to present new information or analysis in order to meet the substantial information standard.

Finally, a lower standard of evidence is required for the Service to reach a positive 90-day finding than is required for the Service to reach a positive 12-month finding, as the preliminary 90-day finding simply involves a determination of whether delisting *may* be warranted. *See, e.g.*, *Humane Soc'y of the U.S. v. Pritzker*, 75 F.Supp.3d 1, 14–15 (D.D.C. 2014) (holding that the National Marine Fisheries Service's application of an "inappropriately high

standard of evidence" at the 90-day finding stage was arbitrary and capricious and that evidence provided in the petition "more than meets that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted"). Where the Service has required conclusive evidence at the 90-day finding stage, courts have routinely held the agency applied too high a burden on petitioners, in violation of the APA. *Id*.; *see also Moden v. U.S. Fish & Wildlife Serv*., 281 F.Supp.2d 1193, 1204 (D. Or. 2003) ("the standard for evaluating whether substantial information has been presented by an 'interested person' is not overly-burdensome, does not require conclusive information, and uses the 'reasonable person' to determine whether . . . action [to delist] may be warranted"); *Ctr. for Biological Diversity v. Morgenweck*, 351F.Supp.2d 1137, 1141–44 (D. Colo. 2004) (setting aside a negative 90-day finding where the agency applied an incorrect standard to require conclusive evidence that the petitioned-for action was warranted); *Colo. River Cutthroat Trout v. Kempthorne*, 448 F.Supp.2d 170, 176–77 (D.D.C. 2006) (holding that the 90-day finding stage is intended to be a "threshold determination" and a "less searching review").

## ARGUMENT

ASL seeks to assist the Court by demonstrating the manner in which the Defendants consistently failed to objectively consider credible scientific and commercial information about the Warbler that indicates the species is not at risk of extinction in the foreseeable future. The Defendants' negative 90-Day Finding on the Petition to Delist—which relied principally on its own prior, flawed analysis published in the Service's 2014 Five-Year Review of the Warbler (AR 6789), which was not a judicially reviewable final agency action—was arbitrary and capricious.

The conclusory nature of the Service's 90-Day Finding is evident in its refusal to reevaluate the significance of "threats" to the continued existence of the Warbler in light of credible scientific information indicating that: (1) the size and distribution of the Warbler population across its breeding habitat is robust and viable; (2) the substantial conservation

actions implemented specifically for, or that incidentally benefit, the Warbler mitigate the impact of certain stressors and the uncertainty of the population information; and (3) the negative effects of certain stressors on the Warbler are less certain than previously believed. Instead, the Service inappropriately evaluated the information in the Petition to Delist in relation to the Service's own prior, non-reviewable species status review that simply presumes that the Warbler is currently at risk of extinction and must be recovered to meet the criteria for delisting. Nowhere has the Service objectively evaluated the significance of the current body of credible scientific and commercial information to the status of the Warbler without the inappropriate presumption that potential stressors are in fact "threats" to the continued existence of the species and that "recovery" must be demonstrated to change the listing status of the Warbler. The Petition to Delist provides the Service with substantial information that supports the delisting of the Warbler in the form of credible new analysis of the body of scientific and commercial information in a manner that objectively reviews the status of the Warbler without the flawed presumption that stressors are threats to the continued existence of the Warbler or that a demonstration of recovery is needed to justify a change in listing status where the original listing was in error.

I.   **THE SERVICE'S 90-DAY FINDING DEMONSTRATES A FLAWED CONSIDERATION OF HABITAT AND POPULATION ESTIMATES**

The Petition to Delist presents credible scientific information, in the form of peer-reviewed publications and other expert technical reports, concluding that the current extent of breeding habitat for the Warbler likely exceeds 4 million acres, distributed widely across the Warbler breeding range, and that the current population of male Warblers is approximately 263,330 individuals. AR 7–8; AR 14–22; AR 87–96; AR 100–01; AR 116–17. The Service acknowledges in the 90-Day Finding that "the known potential range is more extensive than when the [Warbler] was originally listed" and that "the modeling studies described in the 2015 Texas A&M Survey . . . do represent the most recent and comprehensive efforts to estimate range-wide warbler habitat and population size to date." AR 449; AR 442. However, the Service arbitrarily and capriciously discounts the significance of this information in three ways:

1)  By stating that this information is not new ("This and other pertinent information was evaluated in the 2014 Five-Year Review where we recommended that the species remain listed as in danger of extinction throughout its range." AR 442.);

2)  By asserting that population estimates derived from estimates of available habitat are "very difficult to determine" (AR 442) and uncertain ("[I]t is apparent that uncertainty still exists, especially for habitats occupied by warblers at lower-densities." AR 442.); and

3)  By suggesting that the utility of these habitat and population estimates is limited to recovery planning ("Efforts to model warbler habitat, estimate patch-level occupancy probabilities, and draw inferences about distribution and abundance of warblers across the landscape will ultimately be useful to the Service in planning and implementing recovery actions and conservation measures designed to provide for the continued existence of the warbler." AR 442. "The Service does plan to apply these and other modeling efforts, in the context of all that is known about the warbler and warbler habitat, to help inform and guide recovery efforts for the warbler now and in the future." AR 442.).

With respect to the presentation of "new" information, it is true that the Service reviewed the publications cited by the Petitioners regarding habitat and population estimates in its 2014 Five-Year Review of the Warbler.  However, the substantial information provided by the Petitioners with respect to these estimates is not the numbers themselves, but the application of these estimates to an assessment of the status of the Warbler and the significance of previously-identified threats to the continued existence of the species ("The best available, peer-reviewed scientific evidence therefore presents a *new perspective* on the golden-cheeked warbler." AR 19 (emphasis added).) The Service has only considered these estimates in the context of demonstrating "recovery" ("[T]hese efforts represent new estimates rather than indicators of positive trends in warbler habitat and population size, and thus do not imply recovery." AR 442) and, to date, has failed to assess how a population of this size and distribution—which is many

times larger than was understood at the time of listing—responds to stressors like habitat loss and habitat fragmentation over the foreseeable future. An objective status review by the Service would not begin with a presumption that the Warbler is at risk of extinction and should not require a demonstration of "recovery," such as a "positive trend in warbler habitat and population size," to justify a change in listing status. Therefore, even under the Service's 2016 revised regulations governing the information standard for ESA petitions, the information and analysis provided by the Petition to Delist is "new," has not been previously evaluated by the Service, and constitutes "substantial information" indicating that delisting may be warranted.

   The Service discounts the significance of the current population estimate by implying it is too uncertain to be reliable (pointing to perceived over-predictions of density in certain types of habitat, *see* AR 6779) and that it is an outlier among the prior estimates ("[T]he differences in the individual population estimates listed above underscores the need for more accurate status and distribution information for the GCWA." AR 6779.). However, the current population estimate has a 95% confidence interval of 223,927–302,620 singing male Warblers. AR 3579-90. Even at the low end of this confidence interval, the estimated population of the Warbler is many times larger than the estimate evaluated at the time of listing. Nor is this estimate an outlier among other estimates based on assessments of the extent of available breeding habitat and warbler density. In the 90-Day Finding, the Service stated that "[p]revious population estimates of the total adult golden-cheeked warbler population range from 14,950 individuals to 26,978 pairs." AR 6779. However, in making this statement, the Services failed to note that Rappole et al. (2003) produced a population estimate of 228,426 individuals with a 95% confidence interval of 227,142 to 228,710 individuals. AR 4387; AR 91; AR 6778–79. The Service also failed to consider that all of the previously published population estimates were generated in essentially the same manner (i.e., by applying generalized estimates for Warbler density in various types of habitat to the estimated extent of such habitat on the landscape), and that recent refinements in identifying the extent of suitable Warbler habitat across the breeding range and the patterns of

Warbler occurrence and abundance in such habitat from across the breeding range actually decrease, with statistical significance, the uncertainty in the population estimates. AR 20–21.

In addition, the Service has for many years relied on population estimates that were even more uncertain and coarsely approximated than the recent estimate cited by the Petition to Delist. In 1990, the Service emergency listed the Warbler based upon a status review of the species, which calculated a 1974 population of 14,950 individuals by simply multiplying estimated Warbler densities by estimated habitat. AR 4175–78; AR 7053–56. The Service conducted a subsequent status review, which produced an estimated Warbler carrying capacity between 4,822 and 16,016 pairs, applying an average density to all identified habitat. AR 7256–59; AR 7053–56. In its 1992 recovery plan for the Warbler ("Recovery Plan"), the Service produced its own population estimate—13,800 territories—by applying densities from Pulich (1976) to habitat estimates from the 1990 status review and then adjusting for recent habitat loss. AR 4175–78; AR 7053–56. In 1995, researchers produced a new estimate for warbler carrying capacity—64,520 individuals—by applying previous density estimates to all habitat. AR 5534–35. Utilizing more recent 1996–1997 satellite imagery, researchers applied Warbler densities, generated from limited field studies, to identified habitat and calculated a total warbler population of 228,426 individuals (with a 95% confidence interval of 227,142–228,710). AR 4387. In a subsequent model, researchers produced a conservative estimate of 13,931–116,565 Warbler pairs by restricting the analysis to high-quality habitat identified in 2004 imagery. AR 5874–76; AR 5883.

Finally, the Service appears to be selectively willing to use the current habitat and population estimates to aid in recovery and conservation planning but not to objectively reassess the status of the Warbler. Such inconsistency is a clear example of the Service's disparate treatment of credible scientific information and of the arbitrary and capricious nature of the Service's ultimate determination on the Petition to Delist. Although the Service did not identify a specific target population size in its Recovery Plan, population estimates can provide a metric to assess the magnitude of stressors on species and are important for evaluating whether these

stressors rise to the level of a threat to the continued existence of the Warbler. AR 7076. Population size relates to the viability of a population; the Service determines that a population is viable if it maintains its potential for evolutionary adaption and is self-sustaining without major genetic or demographic intervention over a long period. AR 7071. In the Recovery Plan, the Service identified population size, as it relates to viability, as an important metric in evaluating a number of stressors and assessing the threat of extinction on the continued existence of the Warbler. AR 7033. The Service established a set of research priorities to aid in these assessments, because "many details of the species' life history have not been adequately studied." AR 7080. Specifically, the Service identified research needs to "determine population sizes . . . necessary to attain and maintain viability" and "determine whether gene flow is provided for among populations," as "[g]ene flow is closely tied to viability." AR 7080–81.

The Service did not objectively review the new information in the Petition to Delist, which provides:

1) A new perspective that the Warbler has a large and distributed population (AR 80–85) and that the Warbler may not be perilously sensitive to stressors such as habitat fragmentation, which the Service considered to be a "threat" to the continued existence of the Warbler (AR 3545–51);

2) Recent estimates of Warbler populations that overlap and provide statistical analyses and measurements of their reliability, unlike earlier population estimates, and utilize more recent imagery and analysis techniques to estimate habitat (AR 80–85); and

3) New models and estimates that should be carefully analyzed, not in relation to recovery, but in relation to the magnitude of stressors that may affect the continued existence of the Warbler.

## II.  THE SERVICE'S 90-DAY FINDING DEMONSTRATES A BIASED CONSIDERATION OF INFORMATION HIGHLIGHTING PURPORTED THREATS

The Service refuses to acknowledge the converging viewpoint among scientists that the Warbler has a large population that is certainly large enough that the types of stressors generally exacerbated by low population sizes do not rise to the level that they are threatening the Warbler's existence. AR 7071–75; AR 977–985; AR 80–85; AR 326–35. The Service employs uncertainty to magnify and elevate the perceived impact of these stressors. Population size, in and of itself, is not a threat to the continued existence of a species; rather, a small population size can interact with stressors (e.g., habitat loss, fragmentation, parasitism and predation, recreation, etc.) and elevate them to a level where they threaten the continued existence of a species. The Petition addressed parasitism, noting, "Brood parasitism varies annually, but is uncommon and represents a small risk to overall warbler nest survival." AR 2463–4; AR 24. The Service replied that "nest parasitism and nest depredation, both of which occur to a varying degree across the range of the warbler, are exacerbated by habitat fragmentation and are considered a moderate threat." AR 445; AR 6785. The Service included in its status review that "[p]redation is a natural occurrence in GCWA habitat; however, increased fragmentation creates increased edge which can increase nest predation and reduce reproductive output." AR 6785; AR 3902. The Service again inflates stressors on the Warbler, going as far to say "that recreation was a threat" to the continued existence of the Warbler. AR 448 (90-Day Finding); AR 6788 (Five-Year Review). This is an assessment the Service based upon one study that found no effect of recreation on Warblers and another that found a decrease in nest success, but acknowledged that "direct cause-and-effect relationships could not be made." AR 448. The Service concluded that, "although we lack certainty about how recreation impacts [Warblers], limited data show that mountain biking may impact nest success." AR 448.

Particularly evident is the bias the Service has against recent modeling efforts, which have used patch-specific densities and randomized range-wide surveys to create patch-specific occupancy probabilities (i.e., the ability to predict the likelihood that a Warbler occupies any

specific patch) and generate population estimates. AR 1591–600; AR 3579–90; AR 21–22. "All range-wide population estimates made since [1976] have been based on the same general method (i.e., the product of warbler territory densities and amount of potential habitat), using territory density estimates derived from a limited number of study sites and the amount of potential habitat estimated from satellite imagery." AR 2414. In spite of the obvious utility of being able to predict where Warblers are (especially considering the difficulties accessing private lands across Texas), the Service considers them simply "new estimates" of the Warbler's population size. AR 442. The Service ignores "at least eight other studies . . . [that] also estimated a much larger warbler habitat and population that was originally thought when the [Service] finalized the [W]arbler listing." AR 80–85; AR 18.

In response to the Petition to Delist, the Service acknowledged that "[e]fforts to model warbler habitat . . . will ultimately be useful," concluding that, "[h]owever, population estimates are very difficult to determine . . ." AR 442; AR 3589. Taken together, it becomes evident that scientists must rely on estimates of the Warbler's population size because there are simply too many of them to count, spread out over too large of an area. The Service applies uncertainty unequally; it ignores evidence that the Warbler's status is secure, while inflating the uncertainty of potential stressors to the dramatic conclusion that they threaten the very existence of the species. The Petition to Delist presented information that the Warbler population size is large and certainly greater than a minimum viable population of 3,000 individuals. AR 16–22; AR 977–985; AR 80–85. Additionally, the species has high movement rates and levels of genetic diversity, indicating that fragmentation is not threatening the continued existence of the warbler. AR 321; AR 3015–26 entire; AR 442–3. Considering the wealth of information gathered since the listing of the species and presented in the Petition to Delist, a reasonable person could conclude that the Warbler may not be threatened with extinction and, at a minimum, the current body of information warrants additional careful and impartial review.

The Service states, "The purpose of recovery is to ensure that the species can maintain itself for an extended period of time without intervention." AR 7074. If the species' status is

stable and viable into the foreseeable future, then the evidence suggests that the Warbler has either recovered since listing or was originally listed in error.

Population estimates are a useful tool in evaluating the magnitude of a stressor on a species. Population size, in and of itself, is not a threat to the continued existence of a species; rather, a small population size can interact with stressors (e.g., habitat loss, fragmentation, predation, overutilization, etc.) and elevate them to a level where they threaten the continued existence of a species. As such, calculating a minimum population size (i.e. the minimum population size needed for a species to persist and maintain its potential for evolutionary adaptation) is useful in determining a target population size that can withstand stressors and continue to exist. AR7071–73. In the Recovery Plan, the Service provided an estimate for a minimum population size that ranged from 500 individuals to the "low thousands" and also calculated its own population estimate of 13,800 territories. AR 7073–74; AR 7053–56. Furthermore, the Service, "[a]cknowledge the known potential range is more extensive than when the [Warbler] was originally listed." AR 449. As the Service calculated its own population estimate by multiplying density estimates by the amount of Warbler habitat, it is logical to conclude their initial population estimate would also be more extensive than the population estimate when originally listed. AR 7053–55.

In 1995, the Service assembled "[f]orty biologists representing 27 agencies, organizations, universities, or companies" and conducted a workshop to develop population targets and conservation recommendations. AR 953. This expert advisory board created recommendations and concluded that "the risk of extinction increases dramatically as the carrying capacity drops below 1,000 breeding pairs . . . This suggests that the minimum habitat objective for management of this species should be creation or maintenance of enough habitat to support a potential population of 1,000 breeding pairs." AR 984. Erring on the side of caution, they recommended a population of 3,000 breeding pairs, and protecting 32,500 acres of prime habitat, to lower the probability of extinction to five percent over 100 years. AR 984. Scaling these conservative targets to the eight recovery regions established in the Recovery Plan results

in a target of 24,000 breeding pairs (48,000 individuals) and 260,000 acres of high quality Warbler habitat. AR 7033; AR 7071–75. The Service, by their own calculations, estimated a warbler population of 13,800 individuals and 814,219 acres of habitat in the 1992 Recovery Plan. AR 7053–56.

Although the Service is not required to establish that a species has recovered where a petition seeks delisting on the basis of error in the original data relied upon—and in spite of the determination that 3,000 breeding pairs is sufficient to ensure the persistence of the entire species—the Service has arbitrarily decided that recovery criteria have not been met based partially upon the assessment that there is insufficient breeding habitat to ensure a self-sustaining population in each of the eight recovery regions. AR 6777–78; AR 441–43; AR 449; AR 7033; AR 7071–75; AR 984. Additionally, the eight recovery regions are not supported by any biological evidence, as the species has high levels movement that have resulted in high levels of genetic diversity, indicating there is no basis for managing the species as distinct populations. AR 321; AR 3015–26; AR 442–43; AR 23–24; AR 3021–22.

The Service continues to hold the view that the Warbler has not met the recovery criteria, due in part to the notion that habitat loss and fragmentation will continue to impact the Warbler's existence into the foreseeable future. AR 449; AR 6782–83. Habitat loss and fragmentation are relative stressors; they require careful assessment to determine if the resulting impacts of these stressors rise to a level where they can threaten the continued existence of a species. It should be self-evident that a species threatened with extinction resulting from factors related to small population size must have a small population to be threatened with extinction.

### III. THE SERVICE'S 90-DAY FINDING DEMONSTRATES INADEQUATE CONSIDERATION OF CONSERVATION ACTIONS THAT BENEFIT THE WARBLER

The Service has consistently underestimated the amount and extent of conservation that has occurred within the range of the Warbler and the implications of this conservation for balancing stressors on the species, like habitat loss.  Lacking from the Services 2014 Five-Year

Review is consideration of the large amount of private land conservation across the range of the Warbler. For instance, the Texas Land Trust Council maintains a Conservation Lands Inventory of the lands and conservation easements held by land trust organizations across Texas indicates that 432,762 acres of private lands are conserved by land trust organizations in the Edwards Plateau and Cross Timbers ecoregions that generally correspond to the breeding range of the Warbler.  While not all of these lands will contain Warbler habitat and the protections afforded by the conservation easements may only provide incidental benefit to the Warbler (i.e., lands may be generally protected from future development or intensive agricultural use without naming the Warbler as a conservation value), the extent of this inventory certainly warrants additional analysis. The Service reviewed and approved the Southern Edwards Plateau Habitat Conservation Plan in 2015, which contained an analysis of existing conservation lands in a seven-county area near San Antonio, Texas.  This analysis of conservation lands identified approximately 69,000 acres of private lands conservation in the seven-county area that may contain approximately 50,000 to 60,000 acres of Warbler habitat identified by habitat models available at the time. The Service's 2014 Five-Year Review only identifies "over 50,000 ac (20,234 ha) of additional lands owned across the range by cities, counties, conservation organizations, and others," citing to Groce et al. 2010. AR 6784; AR 2416; AR 2556–73. Clearly, the Service's analysis in reaching the negative 90-Day Finding did not include substantial acreage protected by conservation easements on private lands and monitored by land trust organizations.

## CONCLUSION

The Court need not defer to the Service's analysis of the Petition to Delist the Warbler, because the Service's 90-Day Finding was arbitrary, capricious, and unreasonable based on the best available scientific information. The Service undertook a conclusory review of the new information and analyses presented by the Petition to Delist and discounted that information based upon its unreasoned adherence to its own prior analysis in a flawed Five-Year Review of

the Warbler that was not a judicially-reviewable determination of the species' status. For the reasons stated herein, and in Plaintiff's Motion for Summary Judgment, amicus respectfully submits that the basis of the relief requested by Plaintiff is well-founded, and that the relief it seeks should be granted.

Dated:  July 6, 2018　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　NOSSAMAN LLP

　　　　　　　　　　　　　　　By:　　/s/ *Alan M. Glen*
　　　　　　　　　　　　　　　　　　　Alan M. Glen (Texas Bar No. 08250100)
　　　　　　　　　　　　　　　　　　　aglen@nossaman.com
　　　　　　　　　　　　　　　　　　　Sarah C. Wells (Texas Bar No. 24093343)
　　　　　　　　　　　　　　　　　　　swells@nossaman.com
　　　　　　　　　　　　　　　　　　　NOSSAMAN LLP
　　　　　　　　　　　　　　　　　　　816 Congress Avenue, Suite 970
　　　　　　　　　　　　　　　　　　　Austin, TX  78701
　　　　　　　　　　　　　　　　　　　Telephone:     512.651.0660
　　　　　　　　　　　　　　　　　　　Facsimile:      512.651.0770

　　　　　　　　　　　　　　　　　　　*Attorneys for Amicus Curiae*
　　　　　　　　　　　　　　　　　　　*American Stewards of Liberty*

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Robert E. Henneke
Theodore Hadzi-Antich
Ryan D. Walters
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, TX 78701
Tel:   512.472.2700
Fax:   512.472.2728
Email: rhenneke@texaspolicy.com
       tha@texaspolicy.com
       rwalters@texaspolicy.com
*Attorneys for Plaintiff*

Jeffrey H. Wood
Seth M. Barsky
Meredith L. Flax
Devon Lea Flanagan
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources
601 D Street NW
Washington, DC 20004
Tel:   202-305-0201
Fax:   202-305-0275
Email: devon.flanagan@usdoj.gov
*Attorneys for Defendants*

Charles K. Cooper
U.S. ATTORNEY'S OFFICE
816 Congress Avenue
10th Floor
Austin, TX 78701
Tel:   512-370-1262
Fax:   512-916-5854
Email: charlie.cooper@usdoj.gov
*Attorneys for Defendants*

                         */s/ Alan M. Glen*
                         Alan M. Glen