# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

|  |  |  |
|---|---|---|
| GENERAL LAND OFFICE OF THE STATE OF TEXAS, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 1:17-cv-00538-SS |
| v. | ) ) | |
| UNITED STATES FISH AND WILDLIFE SERVICE, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) ) ) ) ) | |

**[PROPOSED]** *AMICUS CURIAE* **BRIEF BY TRAVIS AUDUBON SOCIETY, TEXAS ORNITHOLOGICAL SOCIETY, CENTER FOR BIOLOGICAL DIVERSITY, AND DEFENDERS OF WILDLIFE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

FACTUAL BACKGROUND ......................................................................................................2

LEGAL BACKGROUND ...........................................................................................................4

STANDARD OF REVIEW .........................................................................................................7

ARGUMENT ...............................................................................................................................7

    I.  THE PETITION IGNORED CLIMATE CHANGE ..........................................................8

   II.  THE PETITION FAILED TO ADDRESS CATASTROPHIC WILDFIRE....................11

CONCLUSION..........................................................................................................................13

# TABLE OF AUTHORITIES

## CASES

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ............................................................4, 5

*Miss. River Basin Alliance v. Westphal*, 230 F.3d 170 (5th Cir. 2000) ..........................7

*Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739 (W.D. Tex. 1997).........................6, 7

*Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ............7, 8

## STATUTES

16 U.S.C. § 1531(b) ...............................................................................................5

16 U.S.C. § 1532(3) ...............................................................................................5

16 U.S.C. § 1532(6) ...............................................................................................4

16 U.S.C. § 1532(16) .............................................................................................4

16 U.S.C. § 1532(20) .............................................................................................4

16 U.S.C. § 1533 ....................................................................................................5

16 U.S.C. § 1533(a)(1) ..........................................................................................5

16 U.S.C. § 1533(b)(1)(A) .....................................................................................6

16 U.S.C. § 1533(b)(3)(A) .....................................................................................6

16 U.S.C. § 1533(f) ................................................................................................4

16 U.S.C. § 1536 ....................................................................................................4

16 U.S.C. § 1538 ....................................................................................................4

## REGULATIONS

50 C.F.R. pt. 17(B) ................................................................................................5

50 C.F.R. § 424.11(c) ............................................................................................5

50 C.F.R. § 424.14 .................................................................................................6

50 C.F.R. § 424.14(b)(1) .......................................................................................6

50 C.F.R. § 424.14(h)(i) ........................................................................................6

## RULES

Final Rule to List the Golden-cheeked Warbler as Endangered,
   55 Fed. Reg. 53,153 (Dec. 27, 1990) .............................................................1

Revisions to the Regulations for Petitions,
   81 Fed. Reg. 66,462 (Sept. 27, 2016) .............................................................6

## OTHER SOURCES

Center for Biological Diversity, *A Wild Success, A Systematic Review
   of Bird Recovery under the Endangered Species Act* (June 2016) ....................4

U.S. Fish & Wildlife Service, *Defining Success
   Under the Endangered Species Act* (July 12, 2013) ......................................4

**INTRODUCTION**

The destruction, degradation, and fragmentation of the Golden-cheeked Warbler's ("Warbler") limited range led the U.S. Fish and Wildlife Service ("Service") to list the Warbler as an endangered species under the Endangered Species Act ("the Act") in 1990. U.S. Fish & Wildlife Service, Final Rule to List the Golden-Cheeked Warbler as Endangered, 55 Fed. Reg. 53,153 (Dec. 27, 1990) ("Final Rule"). It is now known that climate change and catastrophic wildfire also threaten the Warbler's continued existence and the species' limited range. As a result, in order to delist the Warbler, the Service would have to determine that these threats no longer endanger the species. However, the Texans for Positive Economic Policy, Susan Combs, the Texas Public Policy Foundation, and the Reason Foundation's (collectively "Petitioners") "Petition to remove the golden-cheeked warbler from the list of endangered species" ("Petition") failed to address climate change and catastrophic wildfire, providing the Service no basis on which to determine that these threats may no longer imperil the Warbler.

The Federal Defendants, in their Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, ECF 67, ably explain why the Service properly found that habitat loss and fragmentation, predation, inadequate regulatory mechanisms, and other natural or manmade factors remain a threat to the Warbler. This brief supplements Defendants' arguments by focusing on the serious threats that climate change and catastrophic wildfire also pose to the Warbler and its habitat. In the interest of judicial economy, the facts and arguments set forth by Federal Defendants in their brief are not repeated here except when necessary.

## FACTUAL BACKGROUND

The Golden-cheeked Warbler, *Setophaga chrysoparia*, is a small migratory songbird which breeds in the mixed juniper and deciduous woodlands of central Texas, and winters in the pine-oak woodlands of southern Mexico and central America.[1] AR006776, AR001152.



The Warbler's limited breeding range, illustrated above, is strictly constrained by the species' reliance on the shredding bark of mature Ashe junipers as nest material. AR006776. Sufficient mature Ashe juniper for the Warbler's breeding purposes is limited to the eastern edge of the Edwards Plateau, the Balcones Escarpment, and the Lampasa Cut Plain. AR002335, AR002336; AR003587 (even within that limited range, optimal habitat is concentrated in the southern-end of the Warbler's breeding range). As the soil and geology of the surrounding region change, Ashe juniper is out-competed and replaced by grasslands, savannas, and agriculture. AR002336. The Warbler's range is also limited to the north by the Dallas-Fort Worth metropolis,

---

[1] Before 2011, the Warbler's scientific name was *Dendroica chrysoparia.* In 2011, the American Ornithologists' Union adopted a new classification which resulted in all *Dendroica* species being placed in a single clade under the generic name *Setophaga.* AR001174. The Service has accepted this new scientific name. AR000440, AR006776.

AR002338, and to the south by an increasingly hotter climate. AR002335–36. Limited to its modern-day boundaries, the Warbler's breeding range is largely incapable of shifting in response to climate change. AR002336; AR002340 (noting that due to Ashe juniper's geographic limitations, "it is highly unlikely that the breeding habitat of the species will be able to shift in response to climate change").

Unfortunately, climate change significantly threatens the Warbler and its limited breeding range as it is likely to increase temperatures, bring longer droughts, and contribute to catastrophic wildfires. AR006786–87. The Service first noted in its 5-Year Review of the Warbler that the effects of climate change, coupled with "the historical and continued loss of the species' breeding habitat," posed a "high magnitude" threat to the Warbler. AR006787–88.

The 5-Year Review also noted that catastrophic large-stand replacement fires are projected to increase, exacerbated by the effects of climate change. AR006787–88. Such fires further destroy and fragment the Warbler's limited habitat, resulting in significant population declines in the affected areas. AR000943, AR004443–44. The risk of catastrophic wildfire is further increased by urban development, which makes it harder to fight large wildfires and contributes to the build-up of the tinder that fuels catastrophic stand replacement fires. AR007402, AR00442, AR006787.

Petitioners submitted their Petition to the Service on June 29, 2015, AR000002, and supplemented their Petition on December 11, 2015. AR000114. Despite the Warbler's continuing vulnerability and highly uncertain future, Petitioners presented no information regarding climate change, and similarly failed to address the effects of catastrophic wildfire on the Warbler and its habitat.

On June 3, 2016, the Service denied the Petition, AR000458, concluding that it failed to present substantial information that the Service had not recently addressed in its 2014 5-year Review, or any information indicating that the original listing was in error. AR000460. Specifically, the Service found that the Petition failed to present substantial information that habitat loss and fragmentation, predation, inadequate regulatory mechanisms, and other natural or manmade factors remain a threat to the Warbler, Defs.' Br. at 16–37, and that the Petition failed to address climate change and catastrophic wildfire. AR000448. Thus, the Service determined that the Warbler "continues to be in danger of extinction throughout its range," AR000460, and that the Petition did not provide substantial information that the Warbler's removal from the list of endangered and threatened wildlife may be warranted. AR000449.

## LEGAL BACKGROUND

Enacted more than 45 years ago, the Act remains "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) ("*TVA*"). Classifying a "species," 16 U.S.C. § 1532(16) (defining "species"), as "endangered" or "threatened" under Section 4 of the Act, *id*. § 1532(6) and (20), is the only way for the Act's highly effective, science-based conservation measures and protections to apply and to reduce threats, slow and reverse the species' trend toward extinction, and set it on the road to recovery.[2] *See, e.g.*, Center for Biological Diversity, *A Wild Success, A Systematic Review of Bird Recovery under the Endangered Species Act* (June 2016), *available at* https://www.esasuccess.org/pdfs/WildSuccess.pdf; *see also* U.S. Fish & Wildlife Service,

---

[2] The Act's substantive protections include the mandate that the Service develop and implement a science-based "recovery plan" for each endangered or threatened species, 16 U.S.C. § 1533(f), the affirmative duty to ensure that federal actions are not likely to jeopardize endangered and threatened species' continued existence, *id*. § 1536, and the prohibition against the unlawful "take" of endangered wildlife. *Id*. § 1538.

*Defining Success Under the Endangered Species Act* (July 12, 2013), https://www.fws.gov/ endangered/news/episodes/bu-04-2013/coverstory/index.html (last visited July 6, 2018). Thus, classifying species as endangered or threatened is a prerequisite to achieving the Act's fundamental purpose of conserving the Nation's imperiled species and "the ecosystems upon which . . . [they] depend . . . ." 16 U.S.C. § 1531(b). This "conservation" purpose entails the use of "all methods and procedures necessary" to "bring endangered species or threatened species to the point at which the measures provided pursuant to [the Act] are no longer necessary." *Id.* § 1532(3). Indeed, "[t]he plain language of the Act, and its history and structure, embodies Congress's intent that "endangered species … be afforded the highest of priorities." *TVA*, 437 U.S. at 174.

Section 4 of the Act and its implementing regulations set procedural and substantive requirements for the addition, reclassification, and removal of species from the lists of endangered or threatened species. 16 U.S.C. § 1533; 50 C.F.R. Part 17, Subpart B—Lists. Section 4(a)(1) sets forth five statutory factors for the Service to apply. *Id.* § 1533(a)(1). These five factors are: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting a species' existence. 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c). The Service must list (or reclassify) a species if it determines that "any one or a combination" of these factors have caused the species to be endangered or threatened. 50 C.F.R. § 424.11(c).

The Act allows interested persons to formally petition the Service to add, reclassify, or remove species from the lists of endangered and threatened species, and sets mandatory

deadlines for the Service to respond and make certain determinations in response to such petitions. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14 (2015). Within 90 days of receiving a petition, the Act requires the Service to make a "90-day finding" as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). When the Service reviewed the Petition that Petitioners submitted in 2015, "substantial information" was defined to mean "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b)(1) (2015).[3]

Only when it finds that a petitioned action "may be warranted" at the 90-day finding stage does the Service progress to the next phases of the Act's listing process, a review of the species' status, with public comment—a "status review"—and ultimately, a "12-month finding" (or "listing determination") on whether the petitioned action is: (1) not warranted, (2) warranted, or (3) warranted but precluded by other pending listing decisions. 16 U.S.C. § 1533(b)(3)(A)– (B).

Listing decisions must consider all relevant factors and must be based "solely" on the "best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A); *Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739, 747 (W.D. Tex. 1997) ("The ESA requires the [Service] to disregard politics and to make listing decisions based solely on the best scientific and

---

[3] In 2016, the Service revised this definition, 81 Fed. Reg. 66,462, 66,484 (Sept. 27, 2016), and now defines "substantial scientific or commercial information" to mean:

> . . . credible scientific or commercial information . . . such that a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted. Conclusions drawn in the petition without the support of credible scientific or commercial will not be considered "substantial information."

50 C.F.R. § 424.14(h)(i) (2018).

commercial data available.") ((citing H.R. Rep. No 1625, 95th Cong., 2nd Sess. 13, *reprinted in*
1978 U.S. CODE CONG. & ADMIN. NEWS 9453, 9463) ("[I]ndividuals charged with the
administration of the act do not have the legal authority to weight the political importance of an
endangered species.")). In order to delist a species, the Service must find "that none of the …
five [listing] factors threatens or endangers the species." *Greater Yellowstone Coal., Inc. v.
Servheen*, 665 F.3d 1015, 1024 (9th Cir. 2011) (citing 50 C.F.R. § 424.11(d)).

## STANDARD OF REVIEW

A negative 90-day finding by the Service on a petition to delist a species must be "set
aside" only if the Court concludes, based on the administrative record, that the negative finding
is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Save
Our Springs*, 27 F. Supp. 2d at 746 (quoting 5 U.S.C. § 706(2)(A)). Under this "arbitrary and
capricious" standard of review, the court "begins with a strong presumption in favor of
upholding decisions of the Service on the listing decisions," *Id.* at 747 (citing *Marsh v. Oregon
Nat. Resources Council*, 490 U.S. 360, 375–78 (1989)), and defers to agency determinations
made within the scope of the agency's expertise. *Miss. River Basin Alliance v. Westphal*, 230
F.3d 170, 175 (5th Cir. 2000).

## ARGUMENT

The Warbler, the only endemic breeding bird of Texas, faces existential threats across its
limited range. Since listing, the threats the Warbler faces have unfortunately worsened and are
now compounded by new threats including climate change and catastrophic wildfires. To make a
90-day finding in response to the Petition and to progress to a status review and a 12-month
listing determination, the Service would have had to determine that the Petition provided
substantial information "that none of the … five [listing] factors threatens or endangers the

species." *Greater Yellowstone Coal.*, 665 F.3d at 1024 (holding that the Service must find that none of the five listing factors threatens or endangers a species in order to remove a species from the list of endangered and threatened wildlife) (citing 50 C.F.R. § 424.11(d)). The Petition did not meet this threshold.

Plaintiff failed to present any substantial new information about climate change or catastrophic wildfire, let alone refute scientific evidence that climate change and catastrophic wildfire threaten the Warbler's existence. In addition, as the Service affirmed, the Warbler is still threatened by ongoing habitat destruction and other factors. Defs.' Br. at 16–37.

Because of these many ongoing threats, the Warbler cannot be delisted until the threats to its existence are abated and the Act's substantive protections are no longer required. The relatively low threshold for a positive 90-day finding provides no succor for Plaintiff as no information cannot be "substantial information," and any notion that climate change and catastrophic wildfire might not threaten the Warbler would be entirely unsubstantiated and contrary to the science that was before the Service. The Service's conclusion that Petitioners failed to present substantial information that delisting the Warbler may be warranted, *i.e.,* that these significant threats to the Warbler's existence may have or will be abated, was not arbitrary and capricious in violation of the APA.

## I.    The Petition Ignored Climate Change

The Petition, submitted to the Service in 2015, failed to address the significant threat of climate change to the Warbler's future survival and recovery. But as the Service found in its 2014 Five-Rear Review, climate change significantly threatens the Warbler and its limited breeding range by increasing temperatures within the Warbler's range, the occurrence of longer droughts, and the risk of catastrophic wildfires. AR006786–87. Climate change may also negatively impact the Warbler's winter habitat in Mexico and Central America. AR006788.

In 2009, the U.S. Environmental Protection Agency ("EPA") produced "A Framework for Categorizing the Relative Vulnerability of Threatened and Endangered Species to Climate Change" ("Framework"). AR002285. In the Framework, EPA evaluated the likely impact from climate change on six species including the Warbler. The Framework evaluated the species' "baseline vulnerability to extinction or major population reduction" based on their "life history, demographics, and conservation status" and their "likely vulnerability" to climate change, including their physiological, behavioral, demographic, and ecological responses. AR002286. EPA categorized species as "critically vulnerable," "highly vulnerable," "less vulnerable," and "least vulnerable." AR002286. It then ranked these vulnerability assessments according to the certainty of their outcome. AR002286.

The Framework assessed the Warbler's limited breeding range, within which "[W]arblers are localized to highly fragmented areas" where suitable habitat still occurs. AR002334 (internal citations omitted). EPA found that the mature stands of Ashe juniper-oak woodlands that Warblers depend on are "extremely limited" in central Texas and "confined largely to Cretaceous upland limestone karsts and canyon sides with shallow soils along the eastern edge of the Edwards Plateau, the Balcones Escarpment, and the Lampasa Cut Plain." AR002335; AR002336 ("While Ashe juniper trees occur from northern Mexico to southern Oklahoma and Arkansas, stands of woodland *dominated* or *codominated* by mature Ashe junipers are confined to areas of central Texas where solid geology, soil characteristics, precipitation, and land use are suitable."). As the geology to the north and west of the Warbler's range has become covered by deeper soils, Ashe juniper is being out-competed and replaced by grasslands and savannas. AR002336. EPA noted that the Dallas-Fort Worth metropolis, which is north of the species' remaining habitat, effectively creates habitat barriers 50 miles wide and 30 miles deep.

9

AR002338. To the east, the land is intensively cultivated to the exclusion of Ashe junipers. AR002336. And Warbler expansion to the south is likely limited by an increasingly hotter climate. AR002335–36.

Hence, the Warbler's breeding range is essentially limited to its modern-day boundaries and incapable of shifting in response to climate change. AR002336; AR002340 (noting that due to Ashe juniper's geographic limitations, "it is highly unlikely that the breeding habitat of the species will be able to shift in response to climate change"). EPA found that this limitation, paired with fire and drought, will likely result in "further fragmentation . . . with resulting loss of habitat" for the Warbler, a species "likely to be only just maintaining itself in the face of existing stressors." AR002338.

Moreover, EPA found that the Warbler is physiologically vulnerable to changes in temperature and precipitation and, therefore, the Warbler is susceptible to the increasingly frequent and extreme weather events brought about by climate change, such as longer droughts and more catastrophic wildfires. AR002340. As a result, EPA found the Warbler to be "critically vulnerable" to climate change. AR002286, AR002342.

The Service noted EPA's findings, incorporated them into its 5-Year Review, and determined that climate change posed a "high magnitude" threat to the Warbler. AR006786–88. Far from addressing this "high magnitude threat," the Petition failed to even mention climate change. By not presenting any, let alone substantial, information on climate change, the Petition failed to provide the Service any grounds on which to find that the Warbler is no longer significantly threatened by climate change. Absent such a finding, the Warbler cannot be delisted. Thus, the Service rightly determined that Petitioners failed to present substantial information that a significant threat to the Warbler has abated.

10

**II.      The Petition Failed to Address Catastrophic Wildfire**

Petitioners similarly failed to address the threat of catastrophic wildfires, a significant threat to the Warbler and its breeding habitat that is exacerbated by climate change. AR006787. Specifically, while the Petition did present limited information regarding properly managed moderate fires, AR000071–72, the Petition failed to address high-intensity catastrophic wildfires. And while moderate wildfires may help maintain oak-dominated ecosystems, AR007503, catastrophic wildfire can devastate Warbler habitat and wipe out populations in the affected area. AR004443 (reporting a population decrease of more than 80 percent in burned areas after the 1996 crown fires on Fort Hood).

Catastrophic wildfires can devastate the Warbler's breeding habitat for decades, if not longer. AR004443. Because Ashe juniper recovers very slowly (slower than oak), it can take more than a half century for mature Ashe junipers to reestablish after a significant wildfire. AR000943, AR002475, AR004441. Thus, "re-establishment of breeding and nesting habitat for [Warblers] in [major] burned areas [following a catastrophic wildfire] can not [sic] be expected in the near future or maybe never." AR000943 (referring to areas on Fort Hood that had experienced a sever "canopy burn" in 1996). With the absence of mature Ashe junipers, the Warbler's habitat lacks a critical component that the species depends on for its existence. AR000943.

The risk of severe and catastrophic wildfire in Warbler breeding habitat is increased by urban development, an ongoing threat to the species that has not been abated. AR006787. Development divides habitat into smaller parcels of ownership, making it tougher to fight wildfire. AR002704. Additionally, urban encroachment decreases the occurrence of moderate,

naturally occurring fire, allowing fuel to gather on the ground and setting the stage for catastrophic, intense crown fires. AR007402, AR00442, AR006787.

Plaintiff attempts to argue, for the first time in its brief, that the threat of catastrophic wildlife is "speculative" or only true as "an abstract proposition," asserting that the Service failed to point to specific instances of how catastrophic wildfire has "actually impacted Warbler habitat in any way" when the Service denied the Petition. Pl.'s Br. at 37. As an initial matter, this simply is not true. The Service explicitly cited Reemts and Hansen 2008's discussion of the 1996 crown fires that had burned approximately 15 percent of all available Warbler habitat on Fort Hood as a specific example of how Warbler habitat has been affected by catastrophic wildfire. AR000447 (citing AR004443). Warbler abundance decreased by more than 80 percent in the burned areas following those fires. AR004443.

Furthermore, Plaintiff's characterization of the risk posed by catastrophic wildfire as purportedly "speculative" is simply wrong. The risk of wildfire within the Warbler's range is far from speculative: the number of acres burned each year in Texas has grown from 35,044 acres in 2002 to over 1.5 million acres in both 2006 and 2009 and nearly 4 million acres in 2011. AR006787. The Plaintiff's dismissal of catastrophic wildfire is also absurd. All risk is speculative to some degree. That a threat may be speculative does not mean that it is not significant or that it will not occur. A driver may have never been in a car accident, but that does not mean that he should never wear a seatbelt. Irrespective of whether it has happened in the past, a car accident without a seatbelt could be catastrophic. Likewise, that the timing and severity of wildfires are, like most things, inherently "speculative" does not mean that the consequences of more frequent and severe wildfires to the Warbler's existence is unworthy of all consideration.

Further belittling the threat of wildfire to the Warbler, Plaintiff misrepresents Reemts and Hansen 2008's acknowledgment that the 1996 crown fires did not greatly affect overall Warbler populations on Fort Hood at the time due to the availability of other nearby suitable habitat. AR00443. This mischaracterization ignores the study's overall conclusion that catastrophic fires threaten the Warbler's recovery because they result in the further "fragmentation and destruction of mature oak-juniper woodlands"—a limited and "critical component of the [Warbler's] nesting habitat" that "recolonizes burned areas very slowly," and which has already been impacted by "increased urban development." AR004444. Plaintiff fails to acknowledge that the Warbler's heavily impacted breeding habitat is finite and assumes that Warblers may simply move to suitable habitat elsewhere without showing that such habitat may be found.[4]

The Service determined that "catastrophic wildfires are a potential threat to the long-term survival and recovery of [the Warbler.]" AR006787. As with climate change, the Petition failed to meaningfully address the threat posed by catastrophic wildfire to the Warbler's continued survival. Because the Petition failed to provide the Service any grounds on which to find that the Warbler's survival is not threatened by catastrophic wildfire, the Warbler cannot be delisted. Thus, the Service rightly determined that Petitioners failed to present substantial information that a significant threat to the Warbler has abated and denied the Petition.

## CONCLUSION

Texas's sole endemic breeding bird is more vulnerable than ever. The Service properly found that the Petition failed to present substantial scientific or commercial information indicating that delisting the Warbler may be warranted. The Plaintiff did not supply substantial

---

[4] Even if available, catastrophic wildfire further fragments Warbler habitat, increasing the negative effects of habitat fragmentation. *See* Defs.' Br. at 19–22 (detailing the negative effects of habitat fragmentation).

information that the species has recovered from its status as an endangered species in the face of these ongoing threats to the species. The Court should accordingly grant summary judgment in favor of the Service as to the sole remaining count in Plaintiff's complaint.

July 6, 2018                                    Respectfully submitted,

/s/ *Ryan Adair Shannon*
Ryan Adair Shannon, *pro hac vice*
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
503-283-5474 ext. 407
rshannon@biologicaldiversity.org

*Attorney for Amicus Curiae Center for Biological Diversity, Travis Audubon Society, and Texas Ornithological Society*

Jason C. Rylander, *pro hac vice*
Defenders of Wildlife
1130 17th Street, NW
Washington, DC 20036
202-772-3245
jrylander@defenders.org

*Attorney for Defenders of Wildlife*

David Frederick
(State Bar No. 07412300)
FREDERICK, PERALES, ALLMON & ROCKWELL, P.C.
1206 San Antonio
Austin, Texas 78701
Telephone: (512) 469-6000
Facsimile: (512) 482-9346