IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**FILED**
January 15, 2020
Lyle W. Cayce
Clerk

No. 19-50178

D.C. Docket No. 1:17-CV-538

GENERAL LAND OFFICE OF THE STATE OF TEXAS,

    Plaintiff - Appellant

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, SECRETARY, U.S. DEPARTMENT OF THE INTERIOR, in his official capacity as Secretary for the United States of the Interior; UNITED STATES FISH AND WILDLIFE SERVICE; GREG SHEEHAN, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service; AMY LUEDERS, in her official capacity as Southwest Regional Director U.S. Fish and Wildlife Service,

    Defendants - Appellees

Appeal from the United States District Court for the
Western District of Texas

Before KING, JONES, and DENNIS, Circuit Judges.

J U D G M E N T

    This cause was considered on the record on appeal and was argued by counsel.

    It is ordered and adjudged that the judgment of the District Court is affirmed in part and reversed in part. The Service's decision is vacated, and the cause is remanded to the Service for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

**Certified as a true copy and issued as the mandate on Mar 09, 2020**

**Attest:** *Lyle W. Cayce*
**Clerk, U.S. Court of Appeals, Fifth Circuit**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
January 15, 2020

Lyle W. Cayce
Clerk

No. 19-50178

GENERAL LAND OFFICE OF THE STATE OF TEXAS,

    Plaintiff - Appellant

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, SECRETARY, U.S. DEPARTMENT OF THE INTERIOR, in his official capacity as Secretary for the United States of the Interior; UNITED STATES FISH AND WILDLIFE SERVICE; GREG SHEEHAN, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service; AMY LUEDERS, in her official capacity as Southwest Regional Director U.S. Fish and Wildlife Service,

    Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before KING, JONES, and DENNIS, Circuit Judges.

KING, Circuit Judge:

    The United States Fish and Wildlife Service listed the Golden-Cheeked Warbler as an endangered species in 1990. Approximately twenty-six years later, the Service denied a petition asking it to delist the Warbler. The General Land Office of the State of Texas claims that both of these decisions are invalid, but its challenge to the Service's decision to list the Warbler is untimely. We agree with the General Land Office, however, that the Service applied the

Case: 19-50178    Document: 00515336439    Page: 2    Date Filed: 03/09/2020
Case 1:17-cv-00538-SS    Document 84    Filed 03/09/20    Page 4 of 20

No. 19-50178

incorrect standard when reviewing the delisting petition. Consequently, we conclude that the Service's decision denying the delisting petition was arbitrary and capricious, vacate that decision, and remand to the Service for further proceedings.

## I.

The General Land Office identifies three issues associated with the Service's decision to list the Warbler and its decision to deny the delisting petition. First, the General Land Office contends that the Service violated the Endangered Species Act (ESA), Pub. L. No. 93-205, 87 Stat. 884 (1973) when it listed the Warbler as endangered, because the Service never designated the Warbler's critical habitat. Second, the General Land Office argues that both of the Service's decisions concerning the Warbler violated the National Environmental Policy Act (NEPA), Pub. L. No. 91-190, 83 Stat. 852 (1970). Third, the General Land Office asserts that the Service violated the ESA and its implementing regulations when reviewing the delisting petition. Because of the central role the ESA and NEPA play in the General Land Office's claims, we begin by describing how those statutes operate.

### A. The Endangered Species Act

The ESA affords certain protections to endangered and threatened species. 16 U.S.C. §§ 1533, 1536, 1538, 1539. An endangered species is defined as "any species which is in danger of extinction throughout all or a significant portion of its range," *id.* § 1532(6), while a threatened species is "any species which is likely to become an endangered species within the foreseeable future," *id.* § 1532(20). The ESA lists five biological factors that can cause a species to be endangered or threatened:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (B) overutilization for commercial, recreational, scientific, or educational purposes;

Case: 19-50178     Document: 00515336439     Page: 3     Date Filed: 03/09/2020
Case 1:17-cv-00538-SS   Document 84   Filed 03/09/20   Page 5 of 20

No. 19-50178

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). Whether a species is endangered or threatened is determined "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account" existing conservation efforts. *Id.* § 1533(b)(1)(A). Similarly, determinations regarding the critical habitat of a species must be determined "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as a critical habitat." *Id.* § 1533(b)(2); *see also id.* § 1532(5)(A) (defining critical habitat).

Determinations regarding whether a species is endangered or threatened are made through a modified form of notice-and-comment rulemaking. 16 U.S.C. § 1533(b)(4). As relevant to this case, upon publication of a final determination that a species is endangered or threatened, its critical habitat should, "to the maximum extent prudent and determinable," be designated "concurrently with" that publication. *Id.* § 1533(a)(3)(A). Even if the critical habitat of an endangered or threatened species is not designated concurrently, it must be designated, "to the maximum extent prudent," within two years of publication of the proposed rule classifying the species. *Id.* § 1533(b)(6)(C)(ii).

The ESA directs the Secretary of the Interior to publish and maintain lists of all endangered and all threatened species. 16 U.S.C. § 1533(c)(1). These lists "shall . . . specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range." *Id.* The ESA calls for, "at least once every five years, a review of

3

Case: 19-50178   Document: 00515336439   Page: 4   Date Filed: 03/09/2020
Case 1:17-cv-00538-SS   Document 84   Filed 03/09/20   Page 6 of 20

No. 19-50178

all species included in a list which is published pursuant to [the ESA] and which is in effect at the time of such review." *Id.* § 1533(c)(2)(A). Following this review, the ESA requires a determination of whether any species should be removed from the lists or moved from one list to the other. *Id.* § 1533(c)(2)(B). Such a determination is made "in accordance" with the provisions governing an initial decision to list a species. *Id.* § 1533(c)(2).

Any interested party can petition to add or remove a species from these lists. 16 U.S.C. § 1533(b)(3). Within ninety days of receiving such a petition, there should, "[t]o the maximum extent practicable," be a finding "as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* § 1533(b)(3)(A). If this ninety-day finding is negative, then it is subject to judicial review. *Id.* § 1533(b)(3)(C)(ii). If the ninety-day finding is positive, then the status of the species must be reviewed. 16 U.S.C. § 1533(b)(3)(B). This review, called a twelve-month review, is followed by a finding regarding whether the petitioned action is warranted, which must be made within twelve months of the petition's receipt. *Id.* The ESA does not provide details regarding what constitutes substantial information, the amount of information required for a positive ninety-day finding, but implementing regulations fill that void. Specifically, when the Service denied the petition to delist the Warbler, then-applicable regulations[1] defined substantial information as "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b)(1) (2014).

---

[1] After the Service denied the delisting petition, the regulations implementing the ESA petition process changed significantly. Substantial scientific or commercial information is now defined as "credible scientific or commercial information in support of the petition's claims such that a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted." 50 C.F.R. § 424.14(h)(1)(i).

## B. The National Environmental Policy Act

Congress passed NEPA "to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment." *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983). Under NEPA, federal agencies must include an environmental impact statement in every "recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *accord City of Dallas v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009). An environmental impact statement is "a detailed statement by the responsible official" regarding, among other things, the "environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(C).

Regulations promulgated by the Council on Environmental Quality instruct agencies on how to determine whether an environmental impact statement is necessary for a particular proposed action, i.e., whether the proposed action has a significant impact on the human environment. *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 224 (5th Cir. 2006). Under those regulations, agencies generally perform an environmental assessment, a "rough cut, low-budget environmental impact statement," to determine whether a full-blown environmental impact statement is necessary. *City of Dallas*, 562 F.2d at 717; *accord* 40 C.F.R. § 1508.9(a)(1). If, as a result of an environmental assessment, an agency concludes that an environmental impact statement is not necessary, the agency issues a finding of no significant impact, "indicating that no further study of environmental impacts is warranted. *City of Dallas*, 562 F.3d at 718. In essence, agencies usually prepare environmental assessments to determine whether proposed actions will have *any* significant

Case: 19-50178 Document: 00515336439 Page: 6 Date Filed: 03/09/2020
Case 1:17-cv-00538-SS Document 84 Filed 03/09/20 Page 8 of 20

No. 19-50178

environmental effects, in which case agencies prepare environmental impact statements to determine what those effects will be.

Before September 21, 1983, the Service prepared environmental assessments for its decisions regarding whether to list or delist species. *See* Preparation of Environmental Assessments for Listing Actions Under the Endangered Species Act, 48 Fed. Reg. 49,244, 49,244 (Oct. 25, 1983). As of that date, however, the Service ceased preparing environmental assessments for such decisions. *Id.* The Service did so because it "accepted [the Council on Environmental Quality's] judgment that . . . listing actions are exempt from NEPA review 'as a matter of law.'" *Id.*[2]

## II.

The Golden-Cheeked Warbler is a songbird with distinctive yellow coloring that breeds exclusively in certain parts of Texas, although it travels to other countries in the winter. Final Rule to List the Golden-cheeked Warbler as Endangered, 55 Fed. Reg. 53,153, 53,154 (Dec. 27, 1990). The Warbler's breeding range "coincides closely with the range of Juniperus ashei (Ashe juniper)," perhaps because the Warbler "depends on Ashe juniper for nesting materials and substrate, and singing perches." *Id.* While the Warbler nests in some oak trees as well as in Ashe junipers, "[e]ven nests in other tree species contain long strips of Ashe juniper bark." *Id.* Ashe junipers "begin sloughing bark near the base at about 20 years, and at the crown by 40 years," so the

---

[2] The Service gave three additional reasons for its decision to cease preparing environmental assessments: (i) none of the approximately 130 environmental assessments prepared by the Service in connection with listing decisions resulted in an environmental impact statement; (ii) the Sixth Circuit had ruled, in *Pacific Legal Foundation v. Andrus*, 657 F.2d 829 (1981), that "as a matter of law an Environmental Impact Statement is not required" for listing decisions and that "preparing EIS's on listing actions does not further the goals of NEPA or ESA"; and (iii) 1982 amendments to the ESA "require[e] listing decisions under the Endangered Species Act to be based solely upon biological grounds and not upon consideration of economic or socioeconomic factors." 48 Fed. Reg. at 49,244-45.

Case: 19-50178  Document: 00515336439  Page: 7  Date Filed: 03/09/2020
Case 1:17-cv-00538-SS  Document 84  Filed 03/09/20  Page 9 of 20

No. 19-50178

"presence of mature Ashe junipers is a major requirement for habitat of golden-cheeked warblers." *Id.*

### A. The Initial Decision to List the Warbler

In 1990, the Service responded to a petition filed by a private citizen by publishing an emergency rule listing the Warbler as endangered for 240 days. Emergency Rule to List the Golden-cheeked Warbler as Endangered, 55 Fed. Reg. 18,844, 18,844 (May 4, 1990). The Service gave "on-going and imminent habitat destruction" in and around Austin, Texas as the justification for its emergency rule. *Id.* The Service reasoned that "[a] relatively small loss of habitat can contribute to fragmentation of a large area," which "reduces the productivity of the remaining habitat because of increased nest parasitism, and increased predation of eggs, young, and adults." *Id.*

Alongside the emergency rule, the Service proposed a rule listing the Warbler as endangered on an indefinite basis. Proposed Rule to List the Golden-cheeked Warbler as Endangered, 55 Fed. Reg. 18,846, 18,846 (May 4, 1990). The proposed rule analyzed each of the five factors specified by the ESA for making determinations regarding whether a species is endangered or threatened, but that analysis focused on the destruction of the Warbler's habitat and the fragmentation of that habitat. *Id.* at 18,847. Specifically, the Service found that "[f]ragmentation in urban counties has limited the number of suitable size habitat patches to between 16-46 percent of the total vegetation structurally suitable for warbler use, and in rural areas the values range from 11-44 percent." *Id.* at 18,847-48. In the proposed rule, the Service did not designate any critical habitat areas because the Service concluded that such areas were "not presently determinable." *Id.* at 18,848. The Service did, however, state its intention to "seek additional agency and public input on critical habitat, along with information on the biological status of, and threats to, the golden-cheeked warbler" during the comment period and "to use this

Case: 19-50178 Document: 00515336439 Page: 8 Date Filed: 03/09/2020
Case 1:17-cv-00538-SS Document 84 Filed 03/09/20 Page 10 of 20

No. 19-50178

and other information in formulating a decision on critical habitat designation." *Id.*

After receiving public comment on the proposed rule, the Service issued a final rule listing the Warbler as an endangered species. Final Rule to List the Golden-cheeked Warbler as Endangered, 55 Fed. Reg. at 53,153. The final rule did not designate critical habitat, because the Service said that "[t]he minimum patch size requirements of the golden-cheeked warbler are not known at this time." *Id.* at 53,159. The Service was "presently funding a study to determine minimum patch size requirements for this species," and the Service acknowledged that it needed to make a critical-habitat designation by May 4, 1992. *Id.* No such designation was ever made.

**B. The Five-Year Review**

Under the ESA, the Service was required to review the Warbler's status at least once every five years, but the first such review was not completed until August 26, 2014. Austin Ecological Servs. Field Office, U.S. Fish & Wildlife Serv., *Golden-Cheeked Warbler (Setophaga Chrysoparia) 5-Year Review: Summary and Evaluation* 2 (2014), https://www.fws.gov/southwest/es/Documents/R2ES/Golden-cheekedWarbler_5YrReview_2014.pdf. That review found that the Warbler "is threatened by ongoing and imminent habitat loss" and noted that a "recent habitat analysis concluded that there had been an estimated 29 percent loss of existing breeding season habitat between 1999-2001 and 2010-2011." *Id.* at 8. According to the five-year review, "[t]he loss of habitat through activities such as residential development often results in the fragmentation of larger contiguous patches of habitat and increased isolation of habitat patches," which has "been shown to influence habitat quality for woodland songbirds" in various ways. *Id.* at 9. Additionally, the five-year review identified several other ongoing threats to the Warbler: (i) "reduced oak recruitment due to herbivory from native and non-native animals" and "death

8

Case: 19-50178      Document: 00515336439     Page: 9     Date Filed: 03/09/2020
Case 1:17-cv-00538-SS   Document 84   Filed 03/09/20   Page 11 of 20

No. 19-50178

of mature oaks from oak wilt," *id.*; (ii) "ongoing destruction and fragmentation of pine-oak forests throughout the [Warbler's] migration and wintering habitat," *id.*; (iii) increased predation caused by habitat fragmentation, *id.* at 11; (iv) increased risk of catastrophic wildfire's in the Warbler's habitat, *id.* at 13; and (v) "accelerating climate change," which "will likely exacerbate existing threats and could result in future threats," *id.* at 14. Synthesizing this information, the five-year review concluded that, "[g]iven the ongoing, widespread destruction of its habitat, [the Warbler] continues to be in danger of extinction throughout its range." *Id.* at 15.

### C. The Delisting Petition

On June 29, 2015, a petition to delist the Warbler was filed by a group of petitioners that did not include the General Land Office. Petition to Remove the Golden-Cheeked Warbler from the List of Endangered Species at 2, 7-8 (2015), *available at* https://ecos.fws.gov/docs/petitions/90100/578.pdf. This petition argued that delisting was warranted, because the Warbler population and the Warbler breeding habitat were larger than the Service believed when it initially listed the Warbler. *Id.* at 13-14; *see also id.* at 15 ("The best available scientific data today shows that habitat is at least five times larger and the warbler population is an order of magnitude larger than estimated in 1990."). Additionally, the delisting petition highlighted a 2015 survey, conducted by the Institute of Renewable Natural Resources at Texas A&M, which "summarized the extensive research and analysis that has been performed since 1990 and concluded that the warbler's listing status should be re-examined." *Id.* at 14.

### D. The Negative Ninety-Day Finding

After reviewing the delisting petition, the Service found that it "does not provide substantial scientific or commercial information indicating that the petitioned action may be warranted." 90-Day Findings on Two Petitions, 81 Fed. Reg. 35,698, 35,700 (June 3, 2016). Accordingly, the Service did not

Case: 19-50178 Document: 00515336439 Page: 10 Date Filed: 03/09/2020
Case 1:17-cv-00538-SS Document 84 Filed 03/09/20 Page 12 of 20

No. 19-50178

Case: 19-50178     Document: 00515336439     Page: 10     Date Filed: 03/09/2020
Case 1:17-cv-00538-SS   Document 84   Filed 03/09/20   Page 12 of 20

No. 19-50178

initiate a twelve-month review and denied the delisting petition. *Id.* The Service explained its reasoning at greater length in a sixteen-page supplemental document that was mentioned, but not included, in the Federal Register. Austin Ecological Servs. Field Office, U.S. Fish & Wildlife Serv., *90-Day Finding on a Petition to Remove the Golden-Cheeked Warbler from the List of Endangered and Threatened Wildlife* (2016) [hereinafter *Negative Ninety-Day Finding*], https://www.regulations.gov/document?D=FWS-R2-ES-2016-0062-0003. That document contains a concise summary of the Service's reasoning:

> A 5-year review for the golden-cheeked warbler was completed on August 26, 2014, in which we recommended that the current classification as endangered should not change. The petition does not present substantial information not previously addressed in the 2014 5-year review for this species and does not offer any substantial information indicating that the petitioned action to delist the species may be warranted. We acknowledge that the known potential range is more extensive than when the golden-cheeked warbler was originally listed. However, threats of habitat loss and habitat fragmentation are ongoing and expected to impact the continued existence of the warbler in the foreseeable future. This and other pertinent information was evaluated in the 2014 5-year review.

*Id.* at 10.

### E. The District Court Proceedings

Following the Service's decision to deny the delisting petition, the General Land Office filed suit against the Service in the United States District Court for the Western District of Texas challenging the Warbler's continued listing as an endangered species. The General Land Office argued that the Service violated the ESA by listing the Warbler as an endangered species without designating the Warbler's critical habitat. It also argued that the Service violated NEPA and its implementing regulations by failing to prepare an environmental assessment or an environmental impact statement in

10

Case: 19-50178 Document: 00515336439 Page: 11 Date Filed: 03/09/2020
Case 1:17-cv-00538-SS Document 84 Filed 03/09/20 Page 13 of 20

No. 19-50178

connection with the Warbler's initial listing or the decision to deny the delisting petition. Additionally, the General Land Office maintained that the Service's negative ninety-day finding—and, hence, the decision to deny the delisting petition—was arbitrary and capricious because the Service applied the incorrect legal standard.

The district court dismissed, on statute-of-limitations grounds, the General Land Office's ESA and NEPA claims to the extent that those claims challenged the Service's initial decision to list the Warbler as an endangered species. The district court also dismissed the entirety of the General Land Office's NEPA claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, reasoning that the Service's initial decision to list the Warbler and its denial of the delisting petition were not subject to NEPA. Finally, the district court granted the Service's motion for summary judgment on the General Land Office's only remaining claim, that the Service's negative ninety-day finding and the resulting denial of the delisting petition were arbitrary and capricious. The General Land Office filed a timely notice of appeal.

### III.

The General Land Office raises three issues on appeal: (i) whether its claims challenging the Service's initial decision to list the Warbler are time barred; (ii) whether the Service's listing decisions must comply with NEPA's procedural requirements; and (iii) whether the Service applied the correct legal standard when issuing the negative ninety-day finding and denying the delisting petition. We address each issue in turn.

### A.

The General Land Office's claims challenging the Service's initial decision to list the Warbler are time barred. With certain exceptions that are not relevant here, "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of

Case: 19-50178 Document: 00515336439 Page: 12 Date Filed: 03/09/2020
Case 1:17-cv-00538-SS Document 84 Filed 03/09/20 Page 14 of 20

No. 19-50178

action first accrues." 28 U.S.C. § 2401(a). The standard rule is that a cause of action accrues when a plaintiff is first able to file suit and obtain relief. *Doe v. United States*, 853 F.3d 792, 801 (5th Cir. 2017) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). This timing requirement is jurisdictional, because it is a condition of the United States' waiver of sovereign immunity. *United States v. Kubrick*, 444 U.S. 111, 117-18 (1979). "Whether the Government is entitled to sovereign immunity from suit presents a question of law that we review de novo." *Doe*, 853 F.3d at 797.

According to the General Land Office, the ESA required the Service to designate the Warbler's critical habitat within two years of publishing the proposed rule listing the Warbler as endangered, i.e., by May 4, 1992, but the Service did not do so. It follows that the General Land Office's ESA claim accrued, at the latest, more than two decades before the General Land Office filed suit. Consequently, § 2401(a) bars this claim. *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1335-36 (11th Cir. 2006) (concluding that failure to identify critical habitat is not a continuing violation).

Similarly, NEPA and its implementing regulations impose procedural requirements that must, if applicable, be satisfied before an agency becomes irreversibly committed to taking a particular action. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983) ("NEPA requires an agency to evaluate the environmental effects of its action at the point of commitment.").[3] If the Service violated NEPA, that violation was complete—and the General

---

[3] If it were otherwise, NEPA would not "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" of a proposed action or "guarantee[] that the relevant information will be made available to [a] larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).

12

Case: 19-50178 Document: 00515336439 Page: 13 Date Filed: 03/09/2020
Case 1:17-cv-00538-SS Document 84 Filed 03/09/20 Page 15 of 20

No. 19-50178

Land Office's claim accrued—no later than December 27, 1990, when the Service's decision to list the Warbler became final. *See Davis Mountains Trans-Pecos Heritage Ass'n v. Fed. Aviation Admin.*, 116 F. App'x 3, 17 (5th Cir. 2004) (concluding that a NEPA claim accrued when an agency "failed to do something required by NEPA"). Consequently, to the extent that the General Land Office's NEPA claim challenges the Service's initial decision to list the Warbler, that claim is barred by § 2401(a).

The General Land Office attempts to render its claims timely by framing them as ongoing failures to act and then invoking the continuing violation doctrine, but that attempt is unavailing. The continuing violation doctrine does not apply to claims based on discrete actions, *Doe*, 853 F.3d at 802, or to "failures to act" that are properly characterized "as discrete events, not as ongoing, durational conditions." *Texas v. United States*, 891 F.3d 553, 564 (5th Cir. 2018). Further, if "an agency is compelled by law to act within a certain time period" but fails to do so, that failure qualifies as a "discrete agency action." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65-66 (2004). As we have already described, the General Land Office's claims challenging the Service's initial decision to list the Warbler are based on alleged failures to take actions required by the ESA and NEPA before statutory deadlines.

## B.

While we lack jurisdiction over the General Land Office's untimely challenge to the Service's decision to list the Warbler, we can consider the merits of the General Land Office's NEPA claim to the extent that this claim challenges the Service's 2016 decision to deny the delisting petition. The district court's decision dismissing that claim under Rule 12(b)(6) is subject to de novo review. *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 421 (5th Cir. 2013). Because NEPA's procedural requirements do not

13

Case: 19-50178 Document: 00515336439 Page: 14 Date Filed: 03/09/2020
Case 1:17-cv-00538-SS Document 84 Filed 03/09/20 Page 16 of 20

No. 19-50178

apply to the Service's listing decisions, we conclude that the district court's decision was correct.

NEPA does not require agencies to prepare an environmental impact statement if the agency's discretion is constrained by law such that it could not consider the information that would be contained in such a statement as part of its decisionmaking process. *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 769-70 (2004). This result flows from the fact that "inherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Id.* at 767. "It would not . . . satisfy NEPA's 'rule of reason' to require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform." *Id.* at 769; *see also id.* at 767 ("Where the preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a whole, no rule of reason worth that title would require an agency to prepare an EIS.")

The ESA prohibits the Service from considering the information that would be contained in an environmental impact statement when deciding whether to list or delist a species as endangered or threatened. The ESA carefully details the five biological factors that can render a species endangered or threatened, 16 U.S.C. § 1533(a)(1), and it requires decisions about whether a species is or is not endangered or threatened to be made "solely on the basis of the best scientific and commercial data available," *id.* § 1533(b)(1)(A). As the Sixth Circuit put it decades ago:

> [T]he statutory mandate of ESA prevents the [Service] from considering the environmental impact when listing a species as endangered or threatened. . . . The impact statement cannot insure the agency made an informed decision and considered environmental factors where the agency has no authority to consider environmental factors. As far as the determination to list

14

Case: 19-50178    Document: 00515336439    Page: 15    Date Filed: 03/09/2020
Case 1:17-cv-00538-SS   Document 84   Filed 03/09/20   Page 17 of 20

No. 19-50178

a species is concerned, preparing an impact statement is a waste of time.

*Pac. Legal Found. v. Andrus*, 657 F.2d 829, 836 (6th Cir. 1981). Since the Service does not need to prepare environmental impact statements for its listing decisions, environmental assessments—which help agencies figure out whether they need to prepare environmental impact statements—are likewise unnecessary. Consequently, the Service did not violate NEPA or its implementing regulations when it declined to delist the Warbler, and the district court correctly granted the Service's motion to dismiss.

## C.

Although the Service's decision to deny the delisting petition did not violate NEPA, that decision was arbitrary and capricious. We review the district court's contrary conclusion de novo. *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 679 (5th Cir. 1992). An agency decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), if the agency applies an incorrect legal standard, *see Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."); *see also Caring Hearts Personal Home Servs., Inc. v. Burwell*, 824 F.3d 968, 977 (10th Cir. 2016) (Gorsuch, J.) ("[A]n agency decision that loses track of its own controlling regulations and applies the wrong rules in order to penalize private citizens can never stand."); *Humane Soc'y of the U.S. v. Pritzker*, 75 F. Supp. 3d 1, 11 (D.D.C. 2014) ("NMFS acted arbitrarily and capriciously in applying an inappropriately-stringent evidentiary requirement at the 90-day stage.").

The Service was required to respond to the delisting petition by conducting a twelve-month review if the petition contained "substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). Then-applicable regulations specified

15

Case: 19-50178      Document: 00515336439      Page: 16      Date Filed: 03/09/2020
Case 1:17-cv-00538-SS   Document 84   Filed 03/09/20   Page 18 of 20

No. 19-50178

that this standard required "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b)(1) (2014).

The Service *recited* this standard, but a careful examination of its analysis shows that the Service *applied* an inappropriately heightened one. Specifically, to proceed to the twelve-month review stage, the Service required the delisting petition to contain information that the Service had not considered in its five-year review that was sufficient to refute that review's conclusions. *See Negative Ninety-Day Finding, supra*, at 2 ("Much of this argument is based on Mathewson *et al.* (2012, p. 1,123) . . . . The Mathewson *et al.* (2012) study was considered by the Service and discussed in our most recent 5-year review for the warbler . . . ."); *id.* at 3 ("This and other pertinent information was evaluated in the 2014 5-year review where we recommended that the species remain listed as in danger of extinction throughout its range (Service 2014, p. 15)."); *id.* at 5 ("Information provided in the petition is refuted by the 2014 5-year review, in which we conclude . . . ."); *id.* at 6 ("The petition does not provide any *new* information indicating that predation is no longer a threat to the warbler." (emphasis added)); *id.* at 9 ("There are additional threats that we evaluated and identified in the 2014 5-year review . . . . The petition did not present any information to address these threats."); *id.* at 10 ("This and other pertinent information was evaluated in the 2014 5-year review."); *id.* ("No *new* information is presented that would suggest that the species was originally listed due to an error in information." (emphasis added)).

The Service thus based its decision to deny the delisting petition on an incorrect legal standard. Consequently, we conclude that the Service's decision was arbitrary and capricious. We therefore vacate that decision and remand for the Service to evaluate the delisting petition under the correct legal standard. *See Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 (5th Cir. 2019)

16

Case: 19-50178     Document: 00515336439     Page: 17     Date Filed: 03/09/2020
Case 1:17-cv-00538-SS   Document 84   Filed 03/09/20   Page 19 of 20

No. 19-50178

(vacating the portion of an agency rule found to be arbitrary and capricious and remanding to the agency for reconsideration).

## IV

For the foregoing reasons, we AFFIRM the district court in part, REVERSE the district court in part, VACATE the Service's decision denying the delisting petition, and REMAND to the Service for further proceedings.

# United States Court of Appeals
**FIFTH CIRCUIT**
OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

March 09, 2020

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

    No. 19-50178   Gen Land Off of the St of TX v. U.S. Fish and Wildlife, Svc, et al
                USDC No. 1:17-CV-538

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

                Sincerely,

                LYLE W. CAYCE, Clerk

                By: _____
                Renee S. McDonough, Deputy Clerk
                504-310-7673

cc:
    Mr. Adam Warren Aston
    Ms. Rebecca Barho
    Ms. Lisa Bennett
    Mr. Charles Kneeland Cooper IV
    Ms. Ellen Durkee
    Mr. Devon L. Flanagan
    Mr. Theodore Hadzi-Antich
    Mr. Robert E. Henneke
    Mr. Ryan Daniel Walters
    Mr. Paul Stanley Weiland
    Ms. Amelia G. Yowell